SPRUCE COMPANY v. ED MAYS, Doing Business as THE MAYS MANUFACTURING COMPANY, Appellant.—62 S. W. (2d) 824.

Division Two, August 12, 1933.

*Curlee, Nortoni & Teasdale* for appellant.

*Marion C. Early* and *Ivon Lodge* for respondent.

FITZSIMMONS, C.—Defendant Mays appeals from a judgment in favor of plaintiff Spruce Company upon its cause of action in the sum of $3,875, and also in favor of plaintiff upon defendant's counterclaim in the sum of $33,325.83. The amount in dispute fixing our jurisdiction is the sum of the judgment and the counterclaim. During the pendency of this litigation, respondent changed its name from Commercial Electric Supply Company, under which latter name action was brought.

Respondent sued for $2,500, the purchase price of an electric generator and a connected steam engine. The verdict was for this amount with interest from date of purchase. Appellant by his answer denied liability upon grounds restated in the counterclaim. The basis of the counterclaim was that appellant Mays had a franchise for a period of fifty years from April 1, 1913, granting him the exclusive right to establish, operate and maintain an electrical public utility in the city of Leslie, Searcy County, Arkansas, the terms of which franchise were set out in the pleading. Prior to September, 1919, appellant's electric plant in Leslie was destroyed by fire, and, in that month, appellant negotiated with respondent for the purchase of a generator, engine and other apparatus, necessary for a new plant in order that he might comply with the terms of his franchise. At the time market conditions were such that new machinery of the kind needed could not be delivered in less than six or twelve months. In these circumstances, respondent agreed to sell and appellant to purchase the generator, engine and other apparatus in suit. This machinery at the time was at Perryville, Missouri, from which point it was shipped to appellant at Leslie, Arkansas. The counterclaim charged that, at the time of the sale, respondent represented to appellant that this equipment was in first class, workable condition and suitable to the require-

ments of appellant in operating his plant at Leslie, but that in fact it was not as so represented. The particular complaint stated in the counterclaim is that the boxing (called by witnesses the main bearing) of the engine, when operated became unduly heated, causing a knocking and preventing further operation. The counterclaim further alleged that at and prior to the making of the contract of sale, respondent was notified of appellant's franchise contract to furnish electricity in Leslie, and of the conditions and rates of the franchise, and that respondent knew that appellant purchased the generator, engine and other appliances in order that he might fulfill the obligation of his franchise. As a direct result of respondent's failure to deliver to appellant the machinery in the condition agreed upon and suited to appellant's requirements, the counterclaim charged that the city of Leslie canceled the franchise on June 22, 1920, to appellant's damage in the sum of $32,516. Other items of damages making up the total amount of the counterclaim include freight charges, express charges and labor costs in the installation of the generator and engine at Leslie. The answer in addition to what was charged in the counterclaim, alleged that respondent "impliedly as well as directly and specifically" made the representations and warranties heretofore stated.

The sale included transformers and a switchboard. But those apparatus are not involved in this action. The sale took the form of a written proposal dated September 11, 1919, by respondent, describing and pricing separately the articles sold, and an acceptance by appellant. The part of the proposal relating to the generator and engine in suit is as follows: "We propose to furnish you with 101 KVA, Westinghouse, three phase, sixty cycle, 2300 volt, 227 RPM, direct connected generator to a 13x14 Ball simple automatic engine, complete with seven KW, 125 volt, belted exciter and with switchboard and usual accessories . . . f. o. b. Perryville, Missouri, . . . $2,500.00." With fit words of reference to this proposal, appellant, by letter dated at Leslie, Arkansas, September 13, 1919, requested respondent to enter his order and to ship at once the 101 KVA generator and all the other articles listed in respondent's letter of September 11th. Appellant's letter stated that the order was given with the understanding that all the machinery would be shipped by September 27, 1919. But although the evidence shows that the machinery was not started from Perryville to Leslie until November, 1919, the delay is not a question raised by this appeal.

The testimony showed that appellant visited the offices of respondent in St. Louis and dealt with James L. Hardie, Manager of respondent's apparatus department. Appellant informed Hardie of the fire and of his urgent need of plant equipment. Hardie did not have the required machinery in stock, informed Mays of the factory delay

in delivery of new machinery and made inquiries for secondhand apparatus of the kind wanted. Hardie learned that the Union Electric Light and Power Company had substituted a transmission line for a plant at Perryville, Missouri, and had for sale an engine and generator which it had used at that point. Hardie arranged to buy this equipment from the Union Company and to sell it to Mays, f. o. b., Perryville. This was the equipment which was described in the sale proposal and is the subject-matter of the litigation. The Union Company had used it for some time at Perryville. Mays did not see it until it reached Leslie. Hardie did not see it until May, 1920, six months after the engine and generator had been installed at Leslie and five months after he had left the service of plaintiff. It was undisputed that the machinery sold had twice the electrical power rating of the equipment which had been destroyed by fire.

In the negotiations preceding the sale, Hardie learned that Mays wanted the apparatus for the purpose of furnishing electric current in Leslie and, in a general way, that Mays had a franchise. Hardie testified that the two men discussed the suitability of the Union Electric unit for Mays' requirements at Leslie, and Hardie expressed the opinion that the unit would meet those requirements. Mays testified that, at his conference with Hardie preceding the deal, he informed Hardie of the load which the plant would have to carry, of the franchise contract, of the number of street lights and motors which had to be furnished with current, and of the population of the city of Leslie. Mays also testified that Hardie said to him concerning the engine and generator: "They (the Union Electric Company) will guarantee it to us and we will guarantee it to you. We will bill it to you the same as new."

Respondent produced testimony tending to prove that the generator and engine had given good service at Perryville, and that it had been put on board the freight car in good condition. Mays testified that the equipment arrived at Leslie undamaged in the handling except that a pulley was broken. This respondent replaced. The testimony on behalf of appellant in support of his answer and counterclaim was to the effect that the engine and generator were rendered useless by the fact that the fly wheel wobbled, the shaft was bent, the bearings heated and the rotating part of the generator was not true and rubbed the coil. Respondent offered testimony tending to prove that the operating defects of which complaint was made were not due to intrinsic fault of the machinery, but to mistakes made by the servants of appellant in setting up the unit at Leslie. These faults were corrected by installation adjustments made by an engineering expert who was sent to Leslie by the Union Electric Light and Power Company at the instance of respondent. Other facts will be stated in the examination of the assignments of error.

■ I. Appellant charges that the court erred in giving Instruction 3 on behalf of respondent and in refusing to give Instruction C requested by appellant. The basis of the complaint is that the court by its action on these instructions adopted the theory that there was no implied warranty of the fitness of the machinery sold for the use intended. Respondent's given Instruction 3 defined a warranty, and then told the jury that "unless you find and believe from the evidence that plaintiff's representatives told the defendant that the machinery mentioned in the evidence was in first-class condition and would do the defendant's work in a satisfactory manner, or that plaintiff warranted said machinery to be in first-class condition and that it would do defendant's work satisfactorily, and that said machinery was not as warranted and that said representation was made for the purpose of inducing defendant to purchase said machinery, and that, except for said warranty or representation, the defendant would not have purchased the same, then there was no breach of warranty on plaintiff's part."

Appellant's refused Instruction C told the jury that if they believed that plaintiff knew of the needs and requirements of defendant's plant and sold defendant the generator for the specific purpose of supplying those needs and filling those requirements, and if the jury should find that the generator vibrated and knocked excessively and the bearings heated up and that the generator was not usable and serviceable for the requirements of defendant's plant; "and if you further find that defendant did not accept said generator or retain same beyond such time as was reasonably employed in efforts to cause it to run properly (if you find it did not run properly), then your verdict will be against the plaintiff and in favor of defendant on plaintiff's cause of action."

The question of express and implied warranties aside, appellant's refused Instruction C should not have been given because there was no evidence to support the hypothesis of non-acceptance and non-retention of the generator. Appellant's own testimony is to the contrary. The apparatus was sold in September, 1919. It was set up at Leslie in November, 1919. The action for the purchase price was begun December 15, 1920, and was tried January 21-24, 1929, and at that trial appellant Mays testified: "Q. After this period of a few months did you do anything more with it—attempt to sell it, keep it, or buy it, or give it back? A. No.

"Q. It is still there, is it? A. Yes; it is still there and we are not using it and haven't used it since then.

"Q. Are you using the building that it is in? A. No; we are not using that building.

"Q. What sort of a building is it? A. Just a power house, that's all, just got this generator in it.

"Q. That building is not used at all? A. No.

"Q. For any purpose? A. No."

The time after which the generator was not run was synchronous with the revocation of appellant's franchise to which further reference will be made. In these circumstances it cannot be said that the trial court by refusing to give Instruction C declined to present to the jury appellant's theory of an implied warranty.

■ Returning now to the question of warranty, appellant in his answer alleged that plaintiff "warranted, represented and assured this defendant that said goods and merchandise were fit for the purposes for which it was intended that they be used." The answer further alleged that "the assurances, promises and warranties given him by plaintiff are more fully set out and contained in defendant's further answer and counterclaim, the allegations of which are hereby incorporated and adopted herein," etc. Appellant's counterclaim alleged that respondent represented to appellant "that said machinery and appliances were in first-class, workable condition and suitable to the requirements of the defendant in operating a plant for furnishing light to said city of Leslie, Arkansas." Respondent's given Instruction 3 in converse terms predicated a verdict for appellant for breach of warranty upon a finding "that plaintiff warranted said machinery to be in first-class condition and that it would do defendant's work satisfactorily and that said machinery was not as warranted." Respondent's Instruction 3 accurately and completely hypothesizes the allegations of appellant's counterclaim concerning a warranty. For this reason and because appellant's refused Instruction C required a finding of a fact which was not a submissible issue, we decline to examine the questions of express and implied warranties, the exclusion of the one by the other, the distinctions between the law of warranties applicable to new and to used machinery and the like. Appellant's refused Instruction D states his theory of express warranty. As it has the same vice as refused Instruction C, we pass it without further comment.

■ II. Appellant urges here that respondent gave an express warranty that the machinery was free from deficiency and perfect by the use of the word "complete" in its written proposition as follows: "We propose to furnish you with 101 KVA, Westinghouse, three phase, sixty cycle, 2300 volt, 277 RPM, direct connected generator to a 13x14 Ball simple automatic engine, *complete* with seven KW, 125 volt, belted exciter and with switchboard and usual accessories." He bases this proposition upon the definition of "complete" in Webster's New International Dictionary as "Filled up; with no part, item or element lacking; free from deficiency; entire, perfect, consummate." Appellant did not present this proposition to the court

below by requesting an appropriate instruction. Therefore it cannot be said that the court erred in failing to instruct that the use of the word "complete" expressly warranted that the machinery sold was free from deficiency and perfect. But we may say that the authority cited by appellant, Town of Checotah v. Town of Eufaula, 31 Okla. 85, l. c. 92, does not support his contention. In that case the Supreme Court of Oklahoma quoted the dictionary definition of "complete" in construing a statute providing when the making of a deposition is deemed to be complete. On the other hand, the Michigan Supreme Court held in the case of McGraw v. Fletcher, 35 Mich. 104, that in a contract for the sale of a diamond drill the proviso that the machine was "to be complete in everything for working" was not an express warranty that the machine would do the work for which it was purchased.

█ III. Appellant assigns as error the refusal of the court to give his requested Instruction G. This instruction predicated a verdict for appellant upon his counterclaim upon a finding that the machinery was sold by respondent to appellant upon a warranty that the machinery was in first-class, workable condition and suitable to appellant's requirements in operating his electrical plant in Leslie, that appellant had a fifty-year electrical utility franchise from the city of Leslie and that respondent had knowledge of this franchise and of appellant's need of the machinery to enable him to operate his plant in compliance with the franchise. The instruction concluded with the direction that if the jury should also find that "the machinery delivered to defendant was not reasonably usable in and fit for defendant's plant and requirements and defendant was thus and thereby directly caused to be unable to furnish light and electric current contracted for under said franchise, and that said city of Leslie canceled said franchise because of defendant's inability (if you so find) to furnish light and current, and that said cancellation (if you so find) directly resulted in loss and damage to defendant, your verdict will be against the plaintiff and in favor of the defendant on his counterclaim, for such sum as will reasonably compensate him for such directly resulting loss and damage, if any, as is shown by the evidence."

In our opinion the trial court rightly refused to give appellant's requested Instruction G, and for two reasons. The first is that the proof offered by appellant in support of his claim of special damages by way of anticipated profits under his fifty-year franchise for a period of forty-four years from 1919 was too uncertain and conjectural to constitute a reasonable and rational basis for the ascertainment and determination of such special damages. [United Iron Works v. Twin City Ice & Creamery Company, 317 Mo. 125, l. c. 138, 295 S. W. 109.]

Appellant offered in evidence one book showing the receipts from meter readings for March, 1920. He testified that when he moved from Leslie in 1921, he left there all books pertaining to his electrical business. He wrote to persons in Leslie to send to him some books for use in the trial at St. Louis. In response they sent to him the book of meter readings and corresponding light bills for March, 1920. Appellant also testified that from April, 1913, when he received the franchise until he ceased operations in 1920, he collected from the city of Leslie $127 per month for street lights. Appellant had a hub mill, a flour mill and other enterprises in Leslie. One man by day and another by night divided his time between one of these mills and the electric plant where each of them did the work of a fireman. Mays was of opinion that these men gave one-third of their time to the plant. Each received a daily wage of $3. Mays estimated that his annual income from the plant from 1913 to 1919 was $7,000 or $8,000. But he stated that this was only an approximate statement.

The law is now well settled that damages may be recovered for loss of profits caused by a breach of contract if the evidence is sufficiently certain and definite to warrant the jury in estimating their extent. [Minneapolis Threshing Machine Co. v. Bradford, 206 Mo. App. 609, 227 S. W. 628.] This rule has become part of the case law of England and the United States since the decision, in 1854, of the English case of Hadley v. Baxendale, 9 Exch. 341. But this court and our courts of appeals have been strict in their evaluation of the sufficiency of the evidence warranting a recovery of damages for loss of profits. Beginning with the early case of Taylor v. Maguire, 12 Mo. 313, followed by the later case of Callaway Mining & Mfg. Co. v. Clark, 32 Mo. 305, 1. c. 310, and by Steffen v. Mississippi River & Bonne Terre Railway Co., 156 Mo. 322, 56 S. W. 1125, down to the late case of United Iron Works v. Twin City Ice & Creamery Co., 317 Mo. 125, 295 S. W. 109, this court uniformly has refused to permit a jury to speculate as to what might be probable or expected profits as an element of damages. Reference is made to the United Iron Works case, 317 Mo. 1. c. 135, et seq., 295 S. W. 109, for a review of the cases on this point. Under the facts and the rulings of those cases, anticipated profits are recoverable only when they are made reasonably certain by proof of actual facts which present data for a rational estimate of such profits. [Morrow v. Missouri Pacific Railroad Co., 140 Mo. App. 200, 123 S. W. 1034, cited with approval in the United Iron Works case, supra.] By this standard, the trial court in the instant case properly refused to submit to the jury the question of damages caused by anticipated loss of profits for a period of forty-four years.

 The second reason why Instruction G properly was refused is that there is no evidence that the city of Leslie repealed the ordinance

giving appellant a franchise as a direct result of the failure of the machinery to function. On the contrary the testimony of appellant Mays was to the effect that some time in 1920, prior to June 22 of that year, the date of the passage of the repeal ordinance, Mays petitioned the Corporation Commission of Arkansas for authority to increase his rate for electrical current from seventeen cents to twenty cents per kilowatt hour. The commission refused to grant the increase, and thereupon Mays quit furnishing current and disconnected his wires from the houses of his patrons in Leslie. The Corporation Commission ordered him to render service, but he persisted in his refusal. On May 29, 1920, he posted on poles in Leslie a letter to citizens explaining his refusal, and on the same day he wrote to the Corporation Commission a letter reiterating his refusal to operate because leave to raise the rates had not been granted. Repeal of appellant's franchise and the enactment of an ordinance granting a franchise to another followed.

■ IV. Appellant complains that the trial court refused to permit him to testify that one Stokes said to him that the shaft was bent. Stokes was chief engineer of the Union Electric Light and Power Company and was sent by that company to Leslie to investigate appellant's complaints, about six months after the machinery was delivered. Stokes in no sense was an agent or servant of respondent. The testimony therefore was properly excluded.

No reversible error appearing, the judgment is affirmed. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All the judges concur.