### (Piston Part Way Down.)

Fig. 1

Fig. 2

### DEFENDANT'S ENGINE.

(Simplified Diagram.)

## TERRE HAUTE BREWING CO., Inc., v. DWYER et al.

### No. 11763.

Circuit Court of Appeals, Eighth Circuit.

Dec. 12, 1940.

John C. Vogel, of St. Louis, Mo., for appellant.

Paul Dillon, of St. Louis, Mo., for appellees.

Before SANBORN and THOMAS, Circuit Judges, and DEWEY, District Judge.

DEWEY, District Judge.

This is an appeal from a judgment on a verdict for alleged breach of contract. The written contract, which it is alleged was breached, was entered into between these parties on the 20th day of August, 1935, and provided, in part, that the Terre Haute Brewing Company, Inc., would take care of all licenses, maintain an adequate warehouse and provide facilities and deliver beer sold by the parties of the second part, W. H. Alston and Timothy J. Dwyer; and maintain proper books and accounts for the purpose of operation of said brewery branch, all at the expense of the Brewing Company.

The parties of the second part to sell to the retail trade in St. Louis and vicinity Champagne Velvet Beer, full strength, at $1.75 a case; that they would receive a commission of 20 cents per case, and 25 cents per case commission if sales exceeded 10,000 cases in any given month. Sales were to be for cash, except to hotels, which might be on a monthly payment basis. Parties of the second part to have the exclusive right to sell the products of this Brewing Company in and about St. Louis from September 1st, 1935, to January 1st, 1936; but if the sales did not average 7,500 cases per month during this period, then the party of the first part had the right to cancel the contract on 30 days' notice.

Paragraph 11 of the contract provided as follows: "It is further contracted and agreed that parties of the second part shall have the right, and an option is hereby given them, to purchase from the Terre Haute Brewing Company, Inc., any time after January 1, 1936, provided this contract is in force at that time, the assets, licenses and business of said brewery branch for a sum in amount equal to the original investment made therein by the Terre Haute Brewing Company, Inc."

Parties of the second part in the event of a purchase of said brewery branch to assume all contracts of the Brewing Company for equipment, leases, etc., and in the event there was a loss to the Brewing Company in operating this branch business at St. Louis from the first day of June, 1935, up to and until the option was exercised the amount of loss should be added to the purchase price above mentioned.

In the event parties of the second part purchased the business and equipment they should have a right to purchase Champagne Velvet Beer for a price of $1.15 per case, f. o. b. St. Louis.

Appellees, plaintiffs below, had started selling beer for this brewing company about the middle of April, 1935, and had taken over from some agents who had not been very successful. The Brewing Company in conformity with their contract procured licenses, an adequate warehouse, provided an office therein and employed a manager and bookkeeper and maintained a supply of Champagne Velvet Beer in the warehouse. They also provided three trucks which delivered regularly and an additional one when needed for week-ends. The Brewing Company paid all the costs of maintenance of the warehouse, deliveries and books. The sales were made for cash, generally collected by the person making the

deliveries. All cash was turned over to the Brewing Company and the commissions were paid at the end of each week by the agent in charge of the distribution plant. By the middle of September appellees had 550 to 650 regular customers and sold the following cases of beer:

| Month | Cases Sold | Month | Cases Sold |
|---|---|---|---|
| May and June | 3363 | September | 8097 |
| July | 7832 | October | 2771 |
| August | 9927 | November | 2972 |
| | | December and January | none. |

The appellees continued as active agents in the sale of this beer until June 1936 when the contract was terminated by the Brewing Company.

In the latter part of September 1935 there was received in the distributing plant and sold by appellees a shipment of bad beer and there was evidence to the effect that this caused a loss of 60 per cent. of appellees' business by the middle of November, and, although the appellees worked as diligently as before, they could not overcome the injury done to their business by the sale of this bad beer, and after October 1935 their earnings did not exceed the drawing account of $250 per month allowed by the contract when the commissions did not earn that amount.

The court in its instruction succinctly set out plaintiffs' claim as follows: "In this case, the plaintiffs bring this suit against the defendant, and the plaintiffs say, in brief, that they entered into a contract with the defendant (and there is no dispute about that, that a contract was entered into), and by this contract the plaintiffs acquired the privilege of selling beer manufactured by the defendant in St. Louis and vicinity, and also acquired the right to purchase the distribution plant of the defendant, which was located in the City, and thereafter, if that plant was purchased by the plaintiffs, that their commission on the sales of defendant's beer was increased to a larger per cent. And the plaintiffs say that after that contract was entered, that the defendant deliberately interfered with and destroyed their business by willfully shipping some bad beer, which plaintiffs distributed to their customers and thereby lost their customers and lost the goodwill of the people with whom they had been dealing, and, consequently, the plaintiffs say they suffered an injury as the result of that. That is the plaintiffs case."

Appellant made a motion at the conclusion of all the evidence for a directed verdict in its favor on the ground that the amended petition, in which is set out the claim of the appellees, recited that the 5,000 cases of beer which is alleged to have been bad was sold to the plaintiffs and purchased by them; that plaintiffs' claim for recovery could only be based upon a breach of an implied warranty for goods purchased, and not for a breach of contract; and as the evidence conclusively establishes that there was no sale of beer by the Brewing Company to the plaintiffs, its claim must fail. It here contends that this motion for a directed verdict should have been sustained. However, the case was tried by the plaintiffs on the theory that the contract was an agency contract and that they were not suing upon a theory of the unmerchantable quality of the goods furnished under a sales contract, but solely by reason of the breach of the contract in furnishing beer that was bad and unfit for consumption. In argument counsel for appellees state that the word "sold" where found in the amended petition was meant to be "sent". There is sufficient in the amended petition to warrant the case being submitted by the court as it was submitted, and as the case will have to be reversed for other reasons, an amendment in this regard to the petition can be had before another trial.

Appellant also contends that as the contract only provided for sales to be made by agents there can be no recovery if the beer was bad as there was no warranty or agreement on the part of the Brewing Company to furnish beer of any specified quality. It will be noted that the contract was for an exclusive sales agency for a specified time and that the Brewing Company was to maintain adequate delivery facilities and to deliver beer sold by the parties of the second part. The beer was to be Champagne Velvet Beer, full strength.

The court submitted the question to the jury on the theory that they should find for the plaintiffs only if the evidence established that the defendant knowingly and intentionally sent the plaintiffs 5,000 cases of beer that were spoiled and unfit for consumption; that if the defendant had no knowledge that the beer was of a defective character, then they should find in favor of the defendant.

Having agreed to supply all the beer of a certain brand appellees would sell for a

definite period and to enable them to build and maintain a business, the intentional furnishing of a beverage unfit for human consumption could not be considered a compliance with that agreement but a breach thereof. It might ·be said in passing that there was evidence to support the findings of the jury in this regard.

The·troublesome question has to do with the apt objection of appellant that the court permitted the jury to speculate upon the question of damages. On this question the court gave the following instruction: "The Court instructs the jury that if you find in favor of the plaintiffs, you will allow plaintiffs such damages as you believe will compensate plaintiffs for ·such earnings as plaintiffs would have been able to earn, if any, up and until July 17, 1936, from the sale of Champagne Velvet Beer, at twenty and twenty-five cents a case commission, if their sales had not been lessened by the selling of bad beer to their customers, knowingly shipped to plaintiffs by defendant on or about September 20, 1935. If you so find that defendant shipped plaintiffs bad beer, which plaintiffs sold to their customers in the City and County of St. Louis, then the Court further instructs the jury that you will allow plaintiffs such damage as you believe the plaintiffs to have been entitled to, resulting from the inability in obtaining the right by plaintiffs to purchase the aforesaid branch of defendant at a price which allowed plaintiffs sixty cents gross profit on the sale of each case of said beer which you so find."

Outside of the evidence as to the number of cases of beer sold and the number of customers and that the agents would receive 20 cents a case commission, there is little evidence on the question of damages in the record. Mr. Dwyer says that the selling of the beer "cost us quite a bit of our own money;" but he does not estimate the amount. A Mr. Thomas B. Smith was employed at least a part of the time to assist in the sales on a weekly salary of $30 a week and expenses, but the time of his employment and the extent of the payments to him are very indefinite. Mr. Alston testified that his money and that of Mr. Dwyer's was spent in procuring customers, but he does not give any estimate of any amount spent. He also says that up to October 1st he personally made approximately $4,500· from selling Champagne Velvet Beer. This statement is out of line with the amount of beer sold on the commission of 20 cents a case.

■ The Supreme Court of Missouri has said: "But this court and our courts of appeals have been strict in their evaluation of the sufficiency of the evidence warranting a recovery of damages for loss of profits. * * * this court uniformly has refused to permit a jury to speculate as to what might be probable or expected profits as an element of damages. * * * anticipated profits are recoverable only when they are made reasonably certain by proof of actual facts which present data for a rational estimate of such profits. * * *" Spruce Co. v. Mays, 333 Mo. 582, 62 S.W. 2d 824, 828.

And "As a general rule, the expected or anticipated profits of a commercial business are too uncertain, speculative, and remote to permit a recovery for their loss. This general rule, however, is subject to the recognized exception that loss of profits from the interruption of an established business may be recovered, provided the amount of actual loss is rendered reasonably certain by competent proof." United Iron Works v. Twin City Ice & Creamery Co., 317 Mo. 125, 136, 295 S.W. 109, 113, and cases therein cited.

"'Profit,' in the ordinary acceptation of the law, is the benefit or advantage remaining after all costs, charges, and expenses have been deducted from the income, because, until then, and while anything remains uncertain, it is impossible to say whether there has been a profit." Morrow v. Missouri Ry. Co., 140 Mo.App. 200, 213, 123 S.W. 1034, 1039.

■ Applying these rules of law to the evidence it is apparent that the plaintiffs in the trial of the case gave little concern to the question of losses to their business but point only to their gross returns. At best, whether or not there was an established business was a question of fact, and without proof of the cost of operation and losses there could not be a rational estimate of profits.

And there is no evidence in the record bearing on the question of damages for failure to obtain the option to purchase the branch office at St. Louis.

There was no evidence of the amount of the original investment, of the equipment, leases, etc., as to whether the branch was operated at a profit or loss, and no evidence of the cost of distributing cases of beer which was to be purchased at $1.15 a case. Neither was there any evidence that the appellees were ever able or willing to

purchase the business, even had the contract not been breached.

Without any evidence to guide the jury as to the value of the plaintiffs' option the instruction of the court permitting the jury to allow plaintiffs such damages as the jury believed the plaintiffs to have been entitled to resulting from the inability in obtaining the right by plaintiffs to purchase defendant's branch business at St. Louis was purely speculative and contrary to the rules of the Supreme Court of Missouri denying the right to recover speculative damages.

The case is reversed and remanded for a new trial.

Reversed.