We rule against appellant's contentions and find the act is not unconstitutional. The judgment should be affirmed and it is so ordered.

All concur.

TNEMEC COMPANY, Inc., a Corporation, Respondent,

v.

NORTH KANSAS CITY DEVELOPMENT COMPANY, a Corporation, Appellant.

No. 44917.

Supreme Court of Missouri.
Division No. 1.

April 9, 1956.

Motion for Rehearing or to Transfer to Court en Banc Denied May 14, 1956.

John W. Oliver, Kansas City, Conn Withers, Liberty, Caldwell, Downing, Garrity & Eastin, Kansas City, Withers & Kizer, Liberty, of counsel, for appellant.

Robert E. Coleberd, Liberty, Richard K. Phelps, Independence, Lawson, Hale & Coleberd, Liberty, Thice, Phelps & Titus, Independence, of counsel, for respondent.

VAN OSDOL, Commissioner.

Defendant North Kansas City Development Company, a corporation (sometimes hereinafter referred to as "Development Company"), has appealed from a judgment for plaintiff, Tnemec Company, Inc. (sometimes hereinafter referred to as "Tnemec"), for $12,500 damages for loss of profits for the months of April and May, 1950. The loss is alleged to have been caused by defendant's failure to carry out an oral agreement relating to the paving of a segment of 23rd Avenue in North Kansas City. Upon this appeal, defendant-appellant contends, inter alia, that plaintiff failed to make out a case for the jury not only as to the alleged oral contract, but also as to proof of damages.

Plaintiff, Tnemec Company, Inc., is engaged and has been engaged since 1921 in the manufacture and sale of industrial paints and coatings, primarily for the preservation of metal, and, until the months of April, May, and June, 1950, had owned and used a plant on Roanoke Street in Kansas City. January 2, 1946, plaintiff entered into a contract to purchase from defendant a tract of land of about three acres lying south of 23rd Avenue and to the westward of Burlington Avenue in North Kansas City. Defendant Development Company retained the ownership of lands lying between Burlington Avenue and the tract bought by plaintiff. It was stipulated in the contract that defendant was to cause a sewer to be constructed in 23rd Avenue to serve a plant or factory plaintiff contemplated building on the east end of its tract. The sewer serving plaintiff's (prospective) plant was to be connected with a sewer main in Burlington Avenue, which street is about one hundred seventy-five feet east of the east end of plaintiff's property. Defendant also agreed to install a water line; to install a fire plug; and to extend a switch track east of and along the east side and to a point even with the north line of plaintiff's property. It was further stipulated that Development Company "does not agree to pave or otherwise improve" 23rd Avenue, which street at that time was surfaced with cinders.

In September, 1949, plaintiff Tnemec decided to build its new plant. Its old plant had become inadequate in capacity for the manufacture and storage of its products. There were conferences between the officers of Tnemec and Development Company relating to the provisions of the contract of January 2, 1946, especially with respect to Development Company's obligations thereunder to install the sewer, water line, hydrant and switch track. For reasons immaterial here, plaintiff also became desirous that 23rd Avenue be properly paved. And

in ensuing conversations and correspondence during the fall of 1949, it was tentatively agreed among plaintiff Tnemec, defendant Development Company, and the Grinnell Corporation (Grinnell had its plant on lands owned by it north of 23rd Avenue) that 23rd Avenue was to be paved, the cost of the paving to be borne proportionally by plaintiff, defendant and Grinnell.

The alleged oral agreement, upon which plaintiff relies, was to the effect that plaintiff agreed to waive the construction of the switch track to the full length and extent of 253.77 feet to a point even with the north line of plaintiff's property, as in effect stipulated in the contract of January 2, 1946. The length of the switch track was to be reduced approximately fifty feet. In consideration of such waiver, defendant Development Company was "forthwith to take the reasonably necessary steps" to negotiate and arrange (with the City of North Kansas City, Grinnell, and with a contractor) for the paving, and to pave 23rd Avenue. The evidence introduced by plaintiff and defendant tending to support and refute the alleged agreement was much in conflict; and defendant as late as March 27, 1950, had not caused the pavement to be laid. Meanwhile, plaintiff's contractor had been building plaintiff's new factory; and, upon the near completion of the building, plaintiff's contractor was looking to the problem of sewage disposal. It was impossible, or at least it was impracticable, to connect a sewer with the sewer main in Burlington Avenue as stipulated in the contract of 1946; but a sewer main was then in process of installation in 26th Avenue, and sewage from plaintiff's plant was eventually drained into that sewer; however, pending the completion of the sewer in 26th Avenue, it became necessary to install a temporary sewer system serving plaintiff's new plant. The parties, plaintiff and defendant, got into a controversy as to which one of them should bear the expense of laying the temporary sewer. It was plaintiff's position that the contract of January 2, 1946, obligated defendant to provide a sewer outlet in any event; and it was defendant's position that (in no way due to defendant's fault) plaintiff's building had been constructed too low for drainage of sewage into the sewer main in Burlington; and that defendant, although willing to ultimately construct a permanent sewer to 26th Avenue, should not be obliged to bear the expense of installing the temporary sewer system.

Conferences concerning the drainage problem reached an impasse sometime in late March, 1950, and, although it has no direct bearing on the issues of the instant case, it was at that time or soon thereafter that the parties became noncooperative and further involved in controversy relating to asserted delay of defendant in arranging for the paving on 23rd Avenue. The sewer dispute "was the straw that broke the camel's back." (Ultimately, plaintiff engaged a contractor to pave the street.) Plaintiff's building contractor completed the building so that it was ready for occupancy about April 12, 1950. Plaintiff made a "piecemeal" movement of some of its old paint-manufacturing mills to the new plant and installed one new mill during April and May, and made a first "trial run" in the new plant on May 4th. Plaintiff, however, did not complete the moving of its equipment, office furniture and supplies until late May or early June.

Plaintiff's new plant in North Kansas City was capable of producing much more of plaintiff's products than its plant on Roanoke Street. It was the theory of plaintiff that defendant had breached its oral agreement by unreasonably delaying the construction of the pavement with ensuing delay in moving plaintiff's equipment over the broken-up, muddy, miry, cindered surface of 23rd Avenue, and that plaintiff was thus deprived for the two-month period of April and May, 1950, of the new plant's increased production facilities and of consequent increased sales and profits, all to plaintiff's damage. The element of damages claimed by plaintiff was "loss of profits," as illustrated by plaintiff's combined principal verdict-directing Instructions Nos. 2 and 3, which were in part as follows,

"The court instructs the jury that if you find and believe from the evidence that on or about January, 1946, plaintiff, by written contract, purchased of defendant the real estate owned by plaintiff as mentioned in evidence as and for a site for the erection of a factory * * * ; and if you further find and believe from the evidence that thereafter and in November, 1949, plaintiff * * * entered into an oral contract with defendant, * * * whereby plaintiff waived the provisions of said written contract of January, 1946, with reference to the obligation of defendant to build a switch track 253.77 feet in length, * * * and if you further find that in consideration of such agreement by plaintiff * * * defendant agreed with plaintiff forthwith to take the reasonably necessary steps with the City of North Kansas City, the adjoining landowners and contractors and immediately thereafter to provide for the paving of 23rd Avenue * * * ; and if you further find that thereafter defendant failed and refused to provide pavement of said 23rd Avenue * * * and if you further find and believe from the evidence as a direct result of such failure and refusal, * * * plaintiff was unreasonably delayed in the construction and equipment of its said proposed building * * * and was deprived of the full use thereof * * * for a period of approximately two months and as a result of such delay plaintiff was unable to remove its manufacturing and office facilities * * * and adequately to furnish its customers the usual products of plaintiff, all for a period of two months, by reason of which plaintiff suffered injury and damage by loss of profits, then your verdict should be in favor of plaintiff * * *."

Plaintiff had alleged that the capacity of the new plant in North Kansas City was five times that of its old plant on Roanoke; that during the alleged 60-day delay plaintiff, using the new equipment installed in the new plant, could have doubled its manufactured output and, inasmuch as plaintiff could not utilize the new plant during that period, it was unable to handle its normal incoming orders promptly, "thus causing serious complaints from its jobbers and representatives and was unable to accept large orders for direct rush shipment, that plaintiff had formulated and started his advertising program on basis of having facilities of new plant available by end of March at a cost of about $12,000.00 on that assumption in preparation for the normal seasonal upsurge in paint sales that occur in April and May each year and that the effectiveness of said program was greatly reduced on account of plaintiff being denied use of new plant facilities, that plaintiff was denied the economies possible in new plant and its better equipment, * * *." However, there was no evidence introduced tending to substantiate the quoted allegation, that is, there was no evidence that any delay, occasioned by the failure of defendant to timely provide paving on 23rd Avenue, kept plaintiff from filling any standing order or deprived plaintiff of accepting and filling additional orders which were or could have been procured.

Plaintiff's sales increased in the third and fourth quarters of 1950 and the four quarters of 1951 over its sales for the four quarters of 1949 and the first and second quarters of 1950. The average quarterly sales for these two six-quarter periods were $193,850 and $134,598, respectively. Plaintiff's secretary-treasurer testified that he estimated plaintiff was damaged in the amount of $21,018.41 by the asserted two-month delay. This estimate was based on analyses of plaintiff's monthly statements of profit (and loss) for the months of April and May of 1950 and for the same months of 1951. According to these statements, plaintiff sustained a loss during the month of April, 1950, of $3,017.85, and realized a profit for the month of May of that year of $8,620.28. There was also testimony that for the month of April, 1951, plaintiff realized a net profit of $25,694.54 and a net profit of $10,279.21 for May of that year. The monthly figure of $25,694.54 for May, 1951, has never been approached in the

history of plaintiff Tnemec's operations. In computing his estimate of the $21,018.41 loss in profits, plaintiff's secretary-treasurer used the total of the profits ($35,973.75) for the months of April and May, 1951, and subtracted therefrom the sum of $9,352.91. This left $26,620.84 from which was subtracted $5,602.43, being the mean profit shown for the two-month period of April and May, 1950. These computations left the remainder, $21,018.41, which sum, as stated, was estimated by the witness to have been the loss occasioned by the alleged delay. The amount of $9,352.91 was allowed as a credit of an approximate twenty-seven per cent increase in sales trends of National Industrial Sales (from the Bureau of the Census) by a stated number of dealers in industrial paints and varnishes throughout the United States. We are of the opinion that the difference in the net profits as shown between the respective two-month periods was relevant to the issue—it was of some value as evidence tending to show that the delay in paving *could* have had a part in causing some loss of profits for the two-month period in 1950, but in our opinion it is not sufficient substantial evidence to support a conclusion upon the question—that is, was any loss of profits due to defendant's fault in delaying the paving as alleged.

There was evidence that the months of March, April, and May are peak months in the industrial paint industry, yet the lesser profit as shown by plaintiff's figures for April and May, 1950, does not necessarily reflect actual profit or loss for these particular months in plaintiff's long-term or year-round manufacturing and sales operations. The profit or loss shown by plaintiff's figures greatly varied in months of various years. These variances indicate that some factors of costs of raw materials, operating or sales expense, or other outlays must have affected the showing of a profit or loss of a particular month. For examples—figures for April, 1950, as stated, showed a loss of $3,017.85, and for November, 1950, a loss of $23,827.10 was shown, yet the profit transferred to surplus for plaintiff's fiscal year ending with November, 1950, was $25,584.89 after the allow-

ances of bonuses in the total amount of $29,065. And the gallonage of production, shown for a paritcular month, does not determine the profit for the month as shown by plaintiff's figures. For example, in July, 1950, plaintiff produced 16,887 gallons of its products and the profit as shown for the month was $10,919, whereas in August (which is also a peak month in the industry) of that year plaintiff produced 16,712 gallons with a shown profit for the month of $6,525. Again it seems the total of the sales for a particular month does not tend to show actual profit for the month's operations. For example, in February, 1951, plaintiff's sales were $52,427 and the shown profit for the month was $3,024, whereas plaintiff's sales for November, 1951, were $52,007 and a loss of $87,588 is shown. (As stated, plaintiff's fiscal year ended with the month of November.)

■ The evidence shows that plaintiff had an established and successful business in its old plant on Roanoke, and has generally enjoyed increased production, sales and profits since it has moved to its new plant; but, obviously, the transition of plaintiff's operations from its old to its new plant was a move looking "to the future," as plaintiff's secretary-treasurer expressed it. As we have seen, the months of April and May were the months during which plaintiff's expanding venture was in its inception. At the time, plaintiff was changing and expanding its production facilities. Profits in its operations in its expanded facilities were in some measure anticipatory. It was plaintiff's position and one of plaintiff's witnesses testified that plaintiff would have had outlets for its products as increased in volume by the use of the new plant in April and May; yet, the witness also agreed that the mere fact "that you produce gallonage or that you make sales does not mean that you will make a profit * * *." Plaintiff's allegation that, because of defendant's alleged fault, plaintiff had not been able to fill standing orders and accept new orders in exploiting its increased productive facilities and its advertising program was not supported by evidence. There was testimony that plaintiff

received a "nice order" of close to seventeen thousand gallons during a period of time from September, 1950, to June, 1951. It seems this order was additional to plaintiff's usual business with the customer. Plaintiff would have been unable to manufacture and fill this new or additional order in plaintiff's old plant; but there was no evidence that plaintiff had received an order of that gallonage (or of any gallonage) in April and May, 1950, which plaintiff was unable to accept by reason of not having sufficient finished products on hand.

In order to prima facie prove plaintiff's case, evidence in the form of reliable data should have been forthcoming so that a jury could reasonably find a loss or a lesser profit for the stated months was due to the delay and could also make a reasonably accurate estimate or approximation of the amount of the loss. It seems that plaintiff was relying solely upon the estimate given by its secretary-treasurer as proof of loss of profits (and of the amount thereof) due to defendant's delay. Plaintiff had the burden of showing he was damaged as a result of the alleged delay. Plaintiff did not introduce evidence tending to show what factors, such as outlay for raw materials, and other costs, charges and expenses, which deducted from income may have made up or contributed in making up and causing the loss (or lesser profit) shown by the figures for the months of April and May. In the absence of some showing (by evidence necessarily within the knowledge and control of plaintiff) which more definitely isolated and accounted for the factors which made up the cause or causes of the loss, monthly statements showing that plaintiff did sustain a loss in April, 1950, or a lesser total or mean net profit for the two months of April and May of that year, during the time of the alleged delay, while some evidence of cause, was not in itself sufficient and substantial evidence to support a reasonable inference by a jury that the delay caused damage to plaintiff.

Not only was it essential that plaintiff should show it suffered damages as a result of the alleged delay, but the law is also well settled that damages may be recovered for loss of profits due to the breach of a contract if the evidence is sufficiently certain and definite to warrant the jury in estimating their extent. This court and the courts of appeals of this state have been strict in evaluating the sufficiency of the evidence warranting a recovery of damages for loss of profits. Our courts have refused to permit a jury to speculate, without substantial basis, as to what might be probable or expected profits as an element of damages. Spruce Co. v. Mays, 333 Mo. 582, 62 S.W.2d 824; United Iron Works v. Twin City Ice & Creamery Co., 317 Mo. 125, 295 S.W. 109; Minneapolis Threshing Mach. Co. v. Bradford, 206 Mo.App. 609, 227 S.W. 628; Morrow v. Missouri Pac. Ry. Co., 140 Mo.App. 200, 123 S.W. 1034; Fireside Marshmallow Co. v. Frank Quinlan Const. Co., 8 Cir., 213 F.2d 16; Terre Haute Brewing Co. v. Dwyer, 8 Cir., 116 F.2d 239; Central Coal & Coke Co. v. Hartman, 8 Cir., 111 F. 96.

We are of the opinion the evidence was not sufficient and substantial in tending to show any loss of profits was caused by the alleged breach of the alleged agreement. Since we are of this opinion, other contentions of the parties are of no decisive significance.

The judgment should be reversed. It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.