RED–E–GAS COMPANY, a corporation, Plaintiff-Appellant,

v.

Harold E. MEADOWS, Defendant-Respondent.

No. 8045.

Springfield Court of Appeals.

Missouri.

Sept. 10, 1962.

James B. Harrison, Sullivan, for plaintiff-appellant.

Paul L. Bell, Steelville, for defendant-respondent.

STONE, Judge.

■ Red-E-Gas Company (hereinafter referred to as plaintiff), a Missouri corporation with its principal place of business in St. Louis County, Missouri, sued Harold E. Meadows (hereinafter referred to as defendant) of Leasburg, Missouri, on a running account for bottled propane gas and for supplies (such as stands, hoods, bases, regulators, tubing and fittings) needed in initiating *bottled* gas service and in installing tanks for *bulk* gas service; and, upon trial, the jury returned a verdict against defendant for $2,364.73, the principal sum sought in plaintiff's petition. Since defendant did not appeal, the judgment entered on that verdict stands unimpugned and unassailed; and, the scope and purpose of our appellate review being to determine whether "error was committed by the trial court *against the appellant*" [Rule 83.13(b), V.A.M.R.; V.A.M.S. § 512.160(2)], we are not concerned as to the propriety of that judgment. Russell Co. v. Spurgeon, Mo.App., 258 S.W. 10, 11. See also Prentice v. Williams, Mo.App., 324 S.W.2d 466, 467(1), and Missouri-Kansas-Texas R. Co. v. Freer, Mo.App., 321 S.W.2d 731, 741.

However, defendant filed a counterclaim in which he alleged (1) a breach by plaintiff of a *written contract* captioned "Dealers Agreement" and executed on September 15, 1952, which pertained to the supplying of *bottled* gas and equipment *to defendant* for use in serving customers to be solicited by defendant in Leasburg and "the community adjacent thereto," and (2) *two* separate breaches by plaintiff of an *oral agreement* entered into "shortly thereafter" (the counterclaim alleged about March 1, 1953) which pertained to the supplying of *bulk* gas *to customers* to be solicited by defendant in the same area. The jury returned a ver-

dict for $3,364.73 against plaintiff on the counterclaim, thus fixing defendant's damages at precisely $1,000 more than the sum awarded plaintiff on its petition. Our present review is upon plaintiff's appeal from that judgment.

By the *written contract* of September 15, 1952, plaintiff (referred to in the contract as Company) granted to defendant (referred to as Dealer) "the only authorized Red-E-Gas dealership for the domestic application of Red-E-Gas and the use of the Red-E-Gas trademark" in Leasburg and the adjacent community, and plaintiff agreed, among other things, that "Company will maintain at all times a supply of Red-E-Gas, in cylinders, at its plant and will supply Dealer * * * in Company owned standard I. C. C. cylinders as hereinafter provided with the consumer requirements of all Red-E-Gas for all Dealer's customers obtaining gas service from or through the Dealer." Among the contractual obligations imposed upon defendant were (a) that "Dealer will not, directly or indirectly, engage in or be connected or concerned with the business of selling or distributing any liquified petroleum gas other than Red-E-Gas obtained from Company" and (b) that "Dealer will not permit the use of Red-E-Gas equipment and cylinders for any purpose other than the utilization of Red-E-Gas, and will exercise every precaution to insure that same is done by each and every consumer that Dealer serves." By its terms, the written contract was to continue in force for one year, unless sooner terminated by defendant upon thirty days' written notice, and thereafter until terminated by either party upon thirty days' written notice.

Defendant entered upon his dealership under the *written contract* with 10 of plaintiff's cylinders filled with propane. When a cylinder was placed in service on the premises of a customer solicited by defendant, the customer signed a contract (copy of which is *not* in the record) which in due course was delivered by defendant to plaintiff's office in St. Louis County; and, for each filled cylinder thus placed in service under a customer contract, plaintiff permitted defendant to take another filled cylinder. Of course, defendant paid for the propane but not for the cylinder, which remained the property of plaintiff. The breach of the *written contract* charged in defendant's counterclaim was that on or about January 11, 1957, plaintiff refused to deliver *additional* cylinders to defendant unless he purchased the cylinders themselves as well as the propane therein. Upon trial, *defendant* was unable to fix the date of this alleged breach more definitely than that it was "probably '56" or between three and four years prior to termination of the written contract in 1960. *Plaintiff's* evidence indicates that the date probably was in October 1956, when the unpaid balance on defendant's open account had reached $2,364.-73 (the principal sum for which this suit subsequently was instituted) and defendant was denied further credit. Whatever the precise date may have been, it appears that defendant's "cylinder float" (i. e., the number of plaintiff's cylinders in service with defendant's customers) then had risen to 326 cylinders.

Plaintiff's officers did not deny that, at this stage of defendant's dealership, they had refused to deliver *additional* cylinders to him; but their testimony suggests (and we use that verb advisedly for there is much in the transcript which simply smacks of suggestion) that such refusal to deliver *additional* cylinders was motivated not only by the state of defendant's open account but also by the compelling consideration that, although defendant's *"cylinder float"* continued to *increase* sharply, the *"turnover"* in those cylinders (i. e., the usage of propane supplied by *plaintiff* as manifested by the refilling of empty cylinders and the exchange of filled cylinders for empty ones) *declined* steadily during 1955 and 1956. As plaintiff's treasurer put it, "they (the cylinders) had to be filled somewhere, they were not being filled by us." Thus, plaintiff concluded that defendant was violating the hereinbefore-quoted contractual obligations

imposed upon him. However, until the *written contract* was terminated in 1960, plaintiff continued to do business with defendant *on a cash basis* and continued to refill empty cylinders and to exchange filled cylinders for empty ones, so that the full extent of plaintiff's alleged breach of the *written contract* was its refusal to deliver *additional* cylinders to defendant which would have resulted in further increase of his then "cylinder float" of 326 cylinders.

By the *oral agreement* entered into about March 1, 1953, defendant was to solicit customers in the same area for *bulk* gas service to be supplied by plaintiff's periodic deliveries of propane from a tank truck into large tanks on the customers' premises. Defendant's solicitation was to include not only prospective customers who already owned suitable tanks but also those to whom plaintiff's tanks might be leased or sold. Under this *oral agreement,* defendant was to install plaintiff's tanks, was to receive from plaintiff $5 for each 500-gallon tank and $10 for each 1000-gallon tank thus leased or sold, and was to be paid by plaintiff one cent per gallon for all propane delivered to *bulk* gas customers obtained by defendant. These customers were to be billed by, and were to make all payments directly to, plaintiff. In this *bulk* gas agency or dealership, defendant obtained some 60 to 65 bulk gas customers for plaintiff. Of these, 21 were served initially in tanks leased from plaintiff (again we note that the form of lease agreement is *not* before us), but 7 of those 21 customers subsequently purchased the tanks so that, at the time of plaintiff's alleged breaches of the oral agreement, only 14 customers were being served in leased tanks.

The *first* breach of the *oral agreement,* as alleged in defendant's counterclaim, was that on or about January 28, 1955, plaintiff notified defendant that it would make no more deliveries of *bulk* gas to customers in the Leasburg area but that, if *defendant* desired to make such deliveries, plaintiff would supply a tank truck to him without charge.

According to defendant, "I told them (plaintiff's officers) at the time I couldn't make deliveries for that price, one cent a gallon, and I asked them for two cents," but "the only thing they would do was to pay the one cent a gallon, that is all." So, "it was either me (defendant) not delivering the gas or accept their offer." Feeling an obligation to service "my customers," defendant took plaintiff's truck and made *bulk* gas deliveries until September 1955, when plaintiff resumed such deliveries.

The *second* breach of the *oral agreement,* as charged by defendant, was that on or about June 22, 1956 (the evidence indicates that the date actually was August 1, 1956), plaintiff again refused to deliver *bulk* gas to customers in the Leasburg area, sold to Hausgas, Inc., the 14 tanks owned by plaintiff but leased to customers in that area, and also gave to Hausgas "the names and addresses of all the defendant's customers." The parties agreed that on or about June 22, 1956, plaintiff had offered to sell the 14 leased tanks to defendant for $4,000 but that defendant then had refused to pay that much for them. *Plaintiff's* evidence was that, when defendant did not accept the $4,000 offer or make a counteroffer within a reasonable time, the tanks were sold to Hausgas on August 1, 1956, for $3,575, so that defendant's *subsequent* offer of $3,500 was simply another instance of "too little too late." *Defendant's* version was that his $3,500 counteroffer had been made over the telephone later on the same day he had rejected plaintiff's original offer, that plaintiff's president then had said that he would "think it over" and would "let you (defendant) know before I do anything about the tanks," but that defendant had heard nothing further about the 14 leased tanks until he learned by chance that they already had been sold to Hausgas.

Although plaintiff unsuccessfully moved for a directed verdict on the counterclaim at the close of the evidence and again by after-trial motion [Rule 72.02, V.A.M.R.; V.A.M.S. § 510.290], plaintiff's only point upon appeal is that defendant's sole instruc-

tion (numbered 2), which purported to cover the counterclaim in its entirety and to authorize a verdict thereon, was prejudicially erroneous in eight particulars. However, two of those specific complaints in substance and effect challenge the sufficiency of the evidence to permit a recovery of damages for the alleged contractual breaches, and to that subject we now address ourselves.

Considering first the alleged breach of the *written contract* (i. e., plaintiff's refusal to deliver *additional* cylinders to defendant), the only evidence, to which defendant's counsel points as in any wise bearing upon the damage resulting therefrom, was (a) that defendant's "cylinder float" had increased from nothing to 326 cylinders during the period from September 1952 to October 1956 and (b) that, in the language of defendant's brief, "the refusal to furnish more cylinders prevented the growth of his bottle gas business and allowed him to obtain a new customer only when he lost one." Counsel argues that "these facts in evidence clearly show (sic) the jury how defendant was damaged and that he was"; and, although conceding that "the extent (of damage) is somewhat speculative," counsel nevertheless insists that "the verdict of the jury was very conservative" and "well supported by the evidence of all the damage."

■■ With this conclusion, we cannot agree. The essence of defendant's claim for damage resulting from plaintiff's alleged breach of the *written contract* was (and still is) that defendant thereby lost potential and anticipated profits which he otherwise could and would have realized from subsequent operation of his *bottle* gas business. Assuming (for the purposes of this discussion) that plaintiff's failure to furnish *additional* cylinders was, as defendant hypothesized in his instruction 2, "without just cause or excuse" and thus actionable, the measure of damages for such breach of contract would have been the loss of the net profits, if any, which defendant would have realized but for the breach.[1] In short, defendant could have recovered only " 'the profit of the bargain.' " Coonis v. City of Springfield, Mo., 319 S.W.2d 523, 527; Clark v. Smalley Tie & Timber Co., Mo. App., 180 S.W. 435, 437. The record presented to us contains no factual data from which a rational estimate could have been made either (a) as to the number of *additional* filled cylinders which defendant reasonably could and probably would have placed in service but for plaintiff's alleged breach of the written contract or (b) as to the net profit per cylinder in service actually realized in the past or reasonably anticipatable in the future.[2] In fact, the transcript does not permit of an informed judgment as to whether defendant had earned *any net profit* in the operation of his bulk gas business under the written contract.

■■ Damages for loss of profits resulting from breach of contract may be recovered if, but only if, "the evidence is sufficiently certain and definite to warrant the jury in estimating their extent"; or, as otherwise stated, "anticipated profits are recoverable only when they are made reason-

1. Rhodes v. Holladay-Klotz Land & Lumber Co., 105 Mo.App. 279, 315(6), 79 S.W. 1145, 1155(6); Phillips v. Todd, Mo.App., 180 S.W. 1039, 1042–1043(6); Suddoth v. Bryan, 39 Mo.App. 652, 659. See also Dingman v. Elizabeth Arden Sales Corp., Mo.App., 284 S.W.2d 16, 18–20(3, 4); Dement v. McNail, Mo.App., 281 S.W. 128, 129(3); American Pub. and Engr. Co. v. Walker, 87 Mo.App. 503, 510(4).

2. In the interest of minimizing the possibility of error upon retrial, it is noted that the mere conclusion or opinion of a witness as to the loss of anticipated profits, *if not predicated upon factual data in evidence which would permit of a rational estimate*, should not be received over a timely and adequate objection and does not constitute competent and substantial evidence to show such loss of profits. Yaffe v. American Fixture, Inc., Mo., 345 S.W.2d 195, 200(6); Tnemec Co. v. North Kansas City Development Co., Mo., 290 S.W.2d 169; Kopff v. Deves, Mo.App., 324 S.W.2d 768, 772; Morrow v. Missouri Pac. Ry. Co., 140 Mo.App. 200, 123 S.W. 1034.

ably certain by proof of actual facts which present data for a rational estimate of such profits."[3] And numerous Missouri cases[4] emphatically declare that a jury should not be permitted to speculate, without substantial basis, as to probable or expected profits, and convincingly demonstrate that our appellate courts have been strict in evaluating the sufficiency of the evidence to warrant a recovery of damages for loss of anticipated profits. Instant defendant had the burden of showing that he had been damaged by the alleged contractual breaches [Tnemec Co. v. North Kansas City Development Co., Mo., 290 S.W.2d 169, 174(3)]; and, to recover more than nominal damages for plaintiff's alleged breach of the *written contract,* it was essential for defendant to prove with reasonable certainty the extent of his loss of *net profits* by reason of such breach. Smalley v. Wunderlich, Mo.App., 62 S.W.2d 919, 920(1); Phillips v. Todd, Mo.App., 180 S.W. 1039, 1042–1043(6). In the light of the authorities hereinbefore cited, it becomes crystal clear that the evidence in the case at bar did not warrant or permit an award of compensatory damages to defendant for loss of anticipated profits by reason of plaintiff's alleged breach of the *written contract.*

■ Wholly aside from the sufficiency of the evidence, defendant's instruction 2 was grossly inadequate and reversibly erroneous in its submission of the issue of damages. In the *first* paragraph of instruction 2, defendant hypothesized what he regarded as the salient provision of the *written contract* and plaintiff's alleged refusal "to perform that part" of the contract and then closed with this unique direction, towit, "if you further find that defendant was damaged by such refusal, then you should ascertain and determine from the evidence what damages, if any, resulted to the defendant." In the *second* paragraph of instruction 2, defendant hypothesized what he regarded as the salient provisions of the *oral agreement;* and, in the *third* paragraph of the instruction, he undertook to hypothesize the *first* alleged breach of the *oral agreement* and then closed with the same direction concerning damages. In the *fourth* paragraph of instruction 2, he undertook to hypothesize the *second* alleged breach of the *oral agreement* and again closed with the same direction concerning damages. No other instruction dealt with or referred to the issue of damages on the counterclaim.

■ The measure of damages in an action for breach of contract is a matter of law for the court to declare in its instructions and not a subject to be left to rank conjecture and unbridled speculation by the jury.[5] If ever there was an instruction to which the overworked appellation of "a roving commission" properly might be applied, instant defendant's instruction 2 must be that instruction. Compare Doll v. Purple Shoppe, 230 Mo.App. 256, 265, 90 S.W.2d 181, 186(5); Phillips v. Todd, supra, 180 S.W. loc.cit. 1042(5). Leaving the proper measure of damages and the permissible elements of damages wholly to the whim and fancy of the jurors, and authorizing them to award damages in whatever sum they might "ascertain and determine from the evidence," instruction 2 in effect invited them to make defendant whole in accordance with

---

3. Spruce Co. v. Mays, 333 Mo. 582, 593, 62 S.W.2d 824, 828(5); Wandell v. Ross, 241 Mo.App. 1189, 1200, 245 S.W.2d 689, 694. See also Coonis v. City of Springfield, Mo., 319 S.W.2d 523, 528(7).

4. Tnemec Co. v. North Kansas City Development Co., supra, 290 S.W.2d loc. cit. 174(5, 6); Kopff v. Deves, supra, 324 S.W.2d loc. cit. 772; Mitchell v. Southwestern Bell Tel. Co., Mo.App., 298 S.W.2d 520, 523(3, 4). See again cases cited in note 3, supra.

5. Doll v. Purple Shoppe, 230 Mo.App. 256, 265, 90 S.W.2d 181, 186(6); Rhodes v. Holladay-Klotz Land & Lumber Co., supra, 105 Mo.App. loc. cit. 314(5), 79 S.W. loc. cit. 1155; Matney v. Gregg Bros. Grain Co., 19 Mo.App. 107, 113(4). See also Suddoth v. Bryan, supra, 39 Mo.App. loc. cit. 658; Morrison v. Yancey, 23 Mo. App. 670, 675.

their unguided, undirected and untrammeled notion of what the fireside equities of the situation revealed by the evidence might have justified. In thus submitting the issue of damages for the alleged contractual breaches, instruction 2 was fatally deficient and reversibly erroneous.[6]

If, with respect to the *oral agreement,* the cause of action on which defendant seeks to recover is one for damages for breach of contract (and it appears to be), we entertain grave doubt whether defendant made a submissible case. For, as we understand the testimony, the *oral agreement* was a contract of agency for an indefinite period of time, its duration was not fixed expressly or impliedly, and its expiration did not depend upon the completion of a given undertaking or upon the happening of a stated event. If that be so, the *oral agreement* was terminable at the will of either party.[7] True, the general rule conceding the right to revoke a contract of this character at will is subject to the *limitation* sometimes stated in this language, towit, that "'where an agent is employed to perform an act which involves expenditure of labor and money before it is possible to accomplish the desired object, after the agent has in good faith incurred expense and expended time and labor, but before he has had a reasonable opportunity to avail himself of the results of this preliminary effort, it could not be permitted that the principal should then terminate the agency, and take advantage of the agent's services, without rendering any compensation therefor.'"[8]

But this limitation, which "reckons with such equities as may have accrued in the agent's favor while acting in good faith" [Meyer v. Pulitzer Pub. Co., 156 Mo.App. 170, 177, 136 S.W. 5, 7], recognizes that in appropriate circumstances the agent may have a cause of action on *quantum meruit* [Glover v. Henderson, 120 Mo. 367, 375, 25 S.W. 175, 177(1); Beebe v. Columbia Axle Co., 233 Mo.App. 212, 223, 117 S.W.2d 624, 631–632(13)]; and instant defendant's counterclaim was not pleaded, tried or submitted on that theory.

■ However, we need not pursue further the unnecessary and unrewarding inquiry as to whether defendant upon the first trial made, or upon retrial may make, a submissible case. For, with plaintiff upon this appeal presenting the single point that instruction 2 was prejudicially erroneous and making the sole request that the judgment on the counterclaim be set aside and the cause be remanded for retrial thereon, its conduct of the case here in effect concedes that on the first trial defendant made a submissible case on his counterclaim [Clooney v. Wells, Mo., 252 S.W. 72, 73(1); Lomax v. Sawtell, Mo.App., 286 S.W.2d 40, 43], and we can neither know nor foresee what may occur upon retrial. Similarly, it becomes unnecessary for us to deal with other specific assaults upon defendant's instruction 2. For, it must be apparent from what we have written that the judgment on the counterclaim may not stand, and in drafting instructions upon retrial defendant's coun-

6. Niehaus v. Gillanders, Mo.App., 184 S.W. 949, 951(3); Phillips v. Todd, supra, 180 S.W. loc. cit. 1042(5). See again the Doll, Rhodes and Matney cases, supra note 5. Consult also Haysler v. Owen, 61 Mo. 270, 273(1); Kick v. Doerste, 45 Mo.App. 134, 140–141(4); Flynt v. Chicago, B. & Q. Ry. Co., 38 Mo.App. 94, 98(2).

7. Superior Concrete Accessories v. Kemper, Mo., 284 S.W.2d 482, 490(16); Staroske v. Pulitzer Pub. Co., 235 Mo. 67, 77, 138 S.W. 36, 39(6). See also Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262, 271(17); Massachusetts Bonding & Ins.

Co. v. Simonds-Shields-Lonsdale Grain Co., 226 Mo.App. 1071, 49 S.W.2d 645, 649(2).

8. Gibbs v. Bardahl Oil Co., Mo., 331 S.W. 2d 614, 615; Glover v. Henderson, 120 Mo. 367, 377(2), 25 S.W. 175, 177; Beebe v. Columbia Axle Co., 233 Mo.App. 212, 219, 117 S.W.2d 624, 629. See also Superior Concrete Accessories v. Kemper, supra, 284 S.W.2d loc. cit. 491–492; Meyer v. Pulitzer Pub. Co., 156 Mo.App. 170, 177, 136 S.W. 5, 7(4); Haynes v. Falstaff Brewing Corp., 8 Cir., 280 F.2d 417; Terre Haute Brewing Co. v. Dugan, 8 Cir., 102 F.2d 425, 427(7).

sel may meet and satisfy the other complaints about instruction 2.

The judgment on defendant's counterclaim is set aside and the cause is remanded for retrial thereon.

RUARK, P. J., and McDOWELL, J., concurred.