METROPOLITAN BROADCASTING
CORPORATION, Appellant,

v.

Mortimer C. LEBOWITZ et al., Appellees.

No. 15851.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 6, 1961.

Decided June 16, 1961.

Petition for Rehearing Denied
July 11, 1961.

Mr. Philip W. Amram, Washington, D. C., with whom Messrs. Gilbert Hahn, Jr., and Mark B. Sandground, Washington, D. C., were on the brief, for appellant.

Mr. David G. Bress, Washington, D. C., with whom Messrs. Leonard Braman and J. H. Krug, Washington, D. C., were on the brief, for appellees.

Before WILBUR K. MILLER, Chief Judge, and EDGERTON and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

The parties had entered into a television advertising contract, weekly performance of which commenced in March, 1958. With new management in control as of August 7, 1958, appellant gave notice of its intention to terminate the contract as of August 31, 1958. Appellees in the District Court unsuccessfully sought an injunction to prevent that cancellation. The appellant cancelled the contract, and appellees then sought damages for the breach. Appellant on brief here conceded that it had "improperly cancelled the contract and is liable for a breach," but now attacks the award of damages. Details follow.

Appellees, as partners, conduct a department store in the District of Columbia known, and hereinafter referred to, as Morton's. Appellant here operates on Channel 5, a television station, WTTG-TV, hereinafter referred to as the Station. In February, 1958, the Station contracted to provide each Sunday one

hour of television time and services[1] for a children's talent program[2] to begin at 11 A.M. Morton's was to pay $225 per week for the first year with an option to renew at $300 per week for an additional year.

Before performance had commenced, the Station found it could sell to another advertiser on alternate Sundays, 15 minutes of the Morton's hour. Following negotiations, the parties agreed that Morton's would relinquish that 15 minutes provided the Station would reduce the rate for the second year[3] to $225 per week and in addition grant two weekly commercial announcements on Class B time.

The modifications having proved acceptable, the Station thus promised in writing to produce the entertainment program and to afford Morton's three weekly commercial announcements in Class A time[4] on a children's hour to "promote the show" and two weekly commercial announcements on Class B time. Morton's was to prepare the commercials and to pay $225 per week for the "package."

The trial judge took testimony first as to the effect of the modified terms as typed into the printed contract form and as supplemented by the Station's letter outlining specific details. "This letter is to be part of your contract No. 58–46 covering the Morton's Talent Program," it read. Thereupon, the trier analyzed this aspect of the case as follows:

"The plaintiffs claim that typewritten Clause 3 on the face of the contract supersedes completely Para-

graph 2(a) on the reverse of the contract and that, therefore, only the plaintiffs had the right to cancel prior to the expiration of the contract.

"The defendant claims that the typewritten Paragraph 3 is merely a limitation on Paragraph 2(a) on the reverse of the contract in respect to the client's right to cancel and that both paragraphs are in effect.

"The Court rules that this situation creates an ambiguity, which can be explained by parole evidence.

"The Court finds as a fact that it was the intention of the parties that typewritten Clause 3 on the face of the contract was to supersede Paragraph 2(a) on the reverse of the contract and, therefore, the Court concludes as a matter of law that the plaintiffs alone had the right to cancel the contract prior to the expiration of its term and that, therefore, the plaintiffs are entitled to recover damages."

The finding and conclusion are clearly supported by substantial and uncontroverted evidence, and, as noted, the Station has here conceded that the contract was improperly terminated.

The trier passed then to the matter of damages. Commenced as a doubtful venture, the Morton's Talent Show popularity had developed as did that of the Station's "Popeye" program, it was urged. Morton's counsel claimed that the true measure of damages turned on "how much it would have cost us during this period to have bought what we got

1. Including all production, master of ceremonies, two cameras, technicians, a director and a piano player, as well as rehearsal time and certain program advertising.

2. Weekly amateur talent contests over a 13 week cycle were to culminate in a prize award to the performer receiving the largest number of audience votes.

3. The Station's answer admitted that the modified contract had granted Morton's the option to renew the contract for another year on the same terms, but assert-

ed the Station had reserved the right to cancel. Judge Holtzoff heard evidence that Morton's alone by the modified agreement had been granted the privilege of cancellation. "Client [Morton's] has option to cancel in 13 week cycles with 4 weeks advance written notice," the amended contract provided, in part.

4. "Selling" announcements at the advertiser's discretion from 6:30 to 11 P.M. Class B time covered similar announcements, but during an afternoon movie presentation.

under the contract," calculated to total $84,627.66.

As to appellant's position, the Station's trial counsel—not its present counsel—was specifically asked by the trial judge:

"[D]o you admit that the proper measure of damages is the difference between what the plaintiffs would have had to pay to get similar services as called for by the contract for the unexpired period of the contract, less the amount they would have had to pay under the contract?

"Mr. Paulson: Yes, your Honor.

"The Court: You admit that?

"Mr. Paulson: Yes, sir.

"The Court: Very well."

Morton's thereupon offered evidence to prove that the value of the Sunday morning program by itself, as compared with Sunday time on the other VHF television stations in the District, was $312.-50 per week[5]; in addition, Morton's lost the advertising during the week on three one minute spots of Class A time on the "Popeye" program, and two one minute announcements on Class B time.[6]

The trial judge might reasonably have concluded that the Station's new management looked askance at Morton's valuable contract which had been developed over the past several months. He might have decided that Morton's lost direct benefits of a value much greater than the mere cost of the Sunday program production. We think he correctly looked to the object of the transaction in its entirety and from its inception and to the manifest intent of the parties. Thus viewed, the contract called for the rendering of unique services tailored to meet the needs of a special situation. Results from advertising, whether by newspaper, handbill, radio or television, it may seem, are not readily to be measured as allocable to a particular source. It is a truism of the market place that favorable word-of-mouth advertising is frequently more desirable than that of other media. Apart from the Sunday programs, the mere use of Morton's name on choice spots during the week may have reached parents among the buying public through their children. Hopalong Cassidy and Roy Rogers are known from coast to coast.

Against the background of record and the arguments of counsel at various stages of the trial, Judge Holtzoff after analysis, announced:

"Accordingly, the Court will allow $312.50 per week for the remainder of the term, including the term of the option. In addition, it will allow the established charges for the announcements that the contract called for, namely, three Class A spots per week, the charge for which was $397.50, and two Class B spots, the charge for which was $120.[7]

\*     \*     \*     \*     \*     \*

---

5. In addition to evidence of record, we may note that the Station in pretrial interrogatories was asked and made reply as follows:
What was your regular charge for each of the following as of September 1, 1958:
(a) One hour television time, from 11 A.M. to noon on Sundays.
(b) Forty-five minutes of television time, from 11 to 11:45 A.M. on Sundays.
Answer: (a) $325 per week, subject to allowance of 15% agency commission, for advertisers broadcasting 52 times or more within one year from the date of the first telecast.
(b) $243.75 per week, subject to allowance of 15% agency commission for advertisers broadcasting 52 times or more within one year from the date of the first telecast.

6. The Station's general manager testified on cross-examination that in 1958 and 1959, the Station's charges for one minute Class A announcements on the "Popeye" program were $132.50 each. As to Class B time, the charge was $60 for a fixed spot.

7. The trier found Morton's had not proved a basis for, and so disallowed, recovery as to the cost of a master of ceremonies, for advertisements in the TV Guide, for a pianist, the cost of a prize and other miscellaneous items. It may be noted that such costs were not recurring in view of the cancellation of the program.

"Accordingly, the damages will be computed at the rate of $829 a week. Can you agree upon the number of weeks remaining?

"Mr. Bress: Seventy-eight, your Honor.

"The Court: Is that correct?

"Mr. Paulson: That is correct, your Honor.

"The Court: Seventy-eight weeks?

"Mr. Paulson: Yes, sir.

"The Court: Have you computed the amount?

"Mr. Bress: Yes, your Honor."

The trier then deducted the contract price of $225, multiplied the difference by 78, and computed total damages at $47,112.

"The Court: Do you agree on that computation?

"Mr. Paulson: That is the correct computation, yes, sir.

"The Court: The Court will render judgment in favor of the plaintiffs against the defendant for the sum of $47,112."

■ We conclude that the award is not without ample support in the record, especially as the judge noted, in the "absence of contradiction."

■ We are not persuaded that the Station is now entitled to complain that Morton's failed to ascertain and establish precise damage when the Station's own wrongful conduct produced the situation. It is sufficient if the wronged party, as here, provided a basis for a reasoned conclusion.[8] Elementary "conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."[9] The Station was in no way precluded from offering independent evidence contrary to that submitted by Morton's,[10] and such as could be elicited from Station's general manager tended to confirm, not refute, what had already been shown.

We may assume that Station's present counsel might have tried the case differently. Points now urged, however, were not raised at trial and will not be considered.[11]

Affirmed.

8. Palmer v. Connecticut Ry. & Lighting Co., 1941, 311 U.S. 544, 561, 61 S.Ct. 379, 85 L.Ed. 336; Eastman Kodak Co. of New York v. Southern Photo Materials Co., 1927, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684; Shapiro, Bernstein & Co. v. Remington Records, Inc., 2 Cir., 1959, 265 F.2d 263, 270; Thompson v. Rector, 1948, 83 U.S.App.D.C. 371, 170 F.2d 167; and see Locke v. United States, Ct.Cl.1960, 283 F.2d 521, 524.

9. Bigelow v. RKO Radio Pictures, 1946, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652.

10. And the burden of doing so rested upon the Station. Detroit Graphite Co. v. Hoover, 1 Cir., 1930, 41 F.2d 490, 494.

11. Friedman v. Decatur Corporation, 1943 77 U.S.App.D.C. 326, 327, 135 F.2d 812, 813.