PLAS–CHEM CORPORATION, a Corporation, Appellant,

v.

SOLMICA, INC., a Corporation, Respondent.

No. 53254.

Supreme Court of Missouri,
Division No. 1.

Dec. 9, 1968.

John P. Montrey, St. Louis, for appellant.

Ackerman, Schiller & Schwartz, by Theodore F. Schwartz, Clayton, for respondent.

HIGGINS, Commissioner.

Petition by Plas-Chem Corporation for $512,913.74 damages for breach of contract, denied by Solmica, Inc., and to which Solmica counterclaimed for $750,000 damages on account of allegedly inferior and unfit

materials purchased by Solmica pursuant to the contract between it and Plas-Chem. Plas-Chem had a verdict for $60,400 damages on its petition and a verdict on Solmica's counterclaim. The court awarded Solmica a new trial on Plas-Chem's petition and entered judgment against Solmica on its counterclaim. Upon this appeal Plas-Chem seeks reinstatement of its $60,400 verdict; Solmica supports the award of a new trial on that issue and seeks a new trial on its counterclaim.

Plas-Chem is engaged in manufacture and sale of industrial coatings. Solmica is engaged in the manufacture and sale of aluminum siding for application to houses. In 1958, E. Dean Jarboe, president of Plas-Chem, accepted the invitation of Solmica's plant superintendent to visit Solmica's plant and observe its manufacture and coating of aluminum siding. Solmica was trying to coat aluminum siding with a "grained" effect and had been working with a roller which produced a grained effect when used with a vinyl-based coating. The result was not satisfactory, however, and Solmica was seeking a different paint or coating. Mr. Jarboe formulated a polyvinyl chloride coating which produced the desired grained effect, and his company began production of this coating in the summer or fall of 1959. Saul Schmidt, president of Solmica, liked the product, Solmica Plasticlad, to the extent of desiring exclusive right to use it.

The contract, which is the subject of this suit, was executed by Plas-Chem and Solmica November 19, 1959. It recited Plas-Chem's ownership of the formula for Solmica Plasticlad, Solmica's desire to have exclusive use of that product for application to siding, and Plas-Chem's desire to sell Solmica Plasticlad to Solmica for use in the manufacture of siding. The parties then agreed: (1) that Plas-Chem shall sell to Solmica in all quantities requested by Solmica, the product known as Solmica Plasticlad at a price not in excess of "thirty percent (30%) above gross cost and it is mutually agreed that gross cost shall include only the cost of material used in the manufacture of this product, provided however, that nothing herein contained shall obligate or require Plas-Chem Corporation to disclose the formulation of the product"; (2) that Plas-Chem shall not sell Solmica Plasticlad to any other company for siding application and Solmica shall not purchase any directly competing product from any other company; (3) that Solmica shall have the right to purchase the product for resale and distribution to other companies; (4) that Plas-Chem shall not sell similar products for siding application in conflict with Solmica Plasticlad; (5) that Dean Jarboe and Carl Geary of Plas-Chem, founders of the formula, shall not form any other organization for distribution of Solmica Plasticlad; (6) that Plas-Chem shall take steps to prevent any of its customers from using Solmica Plasticlad for application to siding; (7) that Plas-Chem guarantees color uniformity and consistency to delivery and receipt by Solmica and shall have no liability for any variations after application of the product to siding; (8) that Solmica Plasticlad is defined as "a plastic composition consisting of polyvinyl chloride resins dispersed in suitable plasticizers, pigments, stabilizers and control agents which upon heating converts into a thermo-plastic solid film exhibiting unique physical and chemical properties"; (9) that Plas-Chem shall have the right to terminate the agreement upon failure of Solmica to make payment within 90 days of invoice dates; (10) that Plas-Chem shall have the right to continue research for improvement of the product and if "any such new formulation of the product constitutes a definite improvement of the product, then the formulation of the material delivered hereunder shall be changed accordingly"; (11) that Solmica, Inc., shall cause " 'Solmica Plasticlad a Product of Plas-Chem Corporation' or words of equivalent meaning" to appear "in all printed advertising of its siding"; (12) that the agreement shall continue for five years, but may be terminated with show of cause by either party upon 120-days' written notice.

Solmica used Solmica Plasticlad primer and finish coat furnished by Plas-Chem to coat their aluminum siding. In the process coiled aluminum sheets were conveyed over a long roller and in the first stage would be cleaned by an alodine process which rendered the aluminum less slick. Primer would be applied at the next stage and it would be heat cured on the conveyor. The finish coat would be applied in the next step, giving the grained effect to the siding. The finish coat was also heat cured. The finished aluminum coil would then be transferred to machines which shaped it into aluminum siding.

The first marketed siding had a problem of dirt from the atmosphere adhering to the siding and it would not wash away in an ordinary rain. Solmica so advised Plas-Chem and Plas-Chem adjusted the formula to make it harder.

A redwood finish was the first color of Plasticlad developed. Then came mahogany, white, beige, blue, pink, yellow, and green. Mr. Jarboe wished more time to test colors, but Solmica was anxious to get a full color line into production and on the market. There were some problems with fading of colors following application of siding to houses.

In 1960, Mr. Jarboe noted a full-page advertisement in the St. Louis Globe-Democrat advertising Solmica Plasticlad aluminum siding without mention of Plas-Chem Corporation. He noted also television programs where commercials were read for Solmica's siding without mention of Plas-Chem Corporation.

In 1960, Mr. Jarboe, while in Solmica's plant, observed coatings manufactured by other companies being used on aluminum siding.

Mr. Jarboe wrote Solmica July 12, 1961, to terminate the agreement between Plas-Chem and Solmica, Inc. At this time sales to Solmica represented about 40 percent of Plas-Chem's total sales. During August and September, 1961, Solmica was fur-

nished primer and coating by Plas-Chem and at time of trial there was an unpaid balance of $12,913.60. Plas-Chem's overhead, after termination of the contract, remained about the same, except it no longer was necessary to buy ingredients for coatings.

On May 1, 1961, Solmica delivered a sample of Plasticlad to Dennis Chemical Company and between July 28, 1961, and November 11, 1961, Dennis sold Solmica 5,198 gallons of vinyl roller finish coating for aluminum siding.

In July or August, 1961, finish coatings for aluminum were purchased from DuPont and Sherwin-Williams in sufficient quantity to run "a couple of million feet" of siding at the rate of one gallon to cover 250 feet of aluminum coil calculated by Plas-Chem to amount to 10,000 gallons of coating.

Between December 31, 1959, and November, 1960, Sam Kalman, an advertising agent, billed a total of $29,925.50 for advertising aluminum siding. $1,700 of this amount was paid by Solmica, Inc., and the remainder by "Solmica of St. Louis, Incorporated," a corporation separate from defendant, Solmica, Inc., controlled by Saul Schmidt and located at the same address as Solmica, Inc. Solmica of St. Louis, Incorporated, was treated by Solmica, Inc., as a retail dealer in aluminum siding. Most of this advertising was over television. Mr. Kalman prepared the copy and submitted it to Mr. Schmidt. On some of the programs a large card containing writing about siding was shown by the cameras.

Plaintiff represents his theory of damages as falling into four categories.

The first item of damages in this theory is the unpaid balance of $12,913.60. In this connection, it should be noted that plaintiff's suit is for damages and not in any part on account.

The second item refers to the purchase of 5,198 gallons of coating from Dennis during pendency of the exclusive contract. This theory is that the contract provided

that the price for coatings was not to exceed 30 percent above gross cost and after price adjustment to cover the dirt pickup problem plaintiff was charged $5.25 per gallon. "Assuming that $5.25 is the cost of material plus about 30% profit * * * the profit per gallon amounts to approximately $1.57 per gallon. 5,198 gallons at $1.57 per gallon equals $8,160.68. * * * Admittedly, this does not produce an exact figure."

For its third category, plaintiff applies the $1.57 "profit" figure to the 10,000 gallons of coating purchased from DuPont and Sherwin-Williams to arrive at the figure $15,700.

It should be noted in connection with items two and three that "gross cost" in the contract included only cost of ingredients and did not account for any other overhead or cost of doing business of Plas-Chem.

The fourth category of damages was the $29,925.50 billed to Solmica, Inc., and to Solmica of St. Louis, Incorporated, for advertising, stated by plaintiff to be "value of advertising."

Solmica had evidence that Plas-Chem did not correct defects in its product and that it had more problems after the attempted correction than before. When Plasticlad proved unsatisfactory, Solmica returned to production of a smooth finish siding. Solmica had numerous complaints of defective siding evidenced by peeling, chipping, chalking, and fading, and it spent considerable money for replacements and corrections.

Plas-Chem's appeal charges the trial court erred in sustaining defendant's motion for a new trial on plaintiff's case for the reasons set forth in paragraphs 4 and 6 of that motion because "there is in the record competent and relevant evidence of facts presenting data from which the jury could reasonably estimate the damages; such evidence show(s) that the jury verdict was not excessive," and for the reasons set forth in paragraphs 26 and 27 of said

motion because "there is competent and material evidence in the record to warrant the argument of counsel concerning the amount of profit lost by plaintiff because of the breach of the contract."

Plas-Chem's theory of trial was to make a case on the law of damages for breach of contract as stated in the Restatement of the Law of Contracts, Volume I, Section 331: "Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty"; and the comment: "Furthermore, there are cases in which the experience of mankind is convincing that a substantial pecuniary loss has occurred, while at the same time it is of such a character that the amount in money is incapable of proof. In these cases the defendant usually has reason to foresee this difficulty of proof and should not be allowed to profit by it. In such cases, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual supervisory power of the court." See also General Ins. Co. of America v. Hercules Construction Co., 8 Cir., 385 F.2d 13, 20; Red-E-Gas Co. v. Meadows, Mo.App., 360 S.W.2d 236, 240; Coonis and Fortner v. City of Springfield, Mo., 319 S.W.2d 523, 528[7]; Spruce Co. v. Mays, 333 Mo. 582, 62 S.W.2d 824, 828[5]; Metropolitan Broadcasting Corp. v. Lebowitz, 110 U.S. App.D.C. 336, 293 F.2d 524, 90 A.L.R.2d 1193.

Pursuant to this theory, Plas-Chem argues that the evidence did afford a sufficient basis for the jury to estimate an amount of damages and to authorize counsel's argument.

There is no quarrel with Plas-Chem's statement of the law; the difficulty in its position lies with the grounds upon which defendant Solmica was granted a new trial.

The trial court sustained defendant's motion for a new trial on plaintiff's case "for

the reasons set forth in paragraphs 4, 6, 26, and 27" of its motion. Paragraph 4 charged: "The verdict of the jury in favor of plaintiff is excessive and grossly excessive and the evidence was wholly insufficient to support the verdict of the jury and the said verdict was based upon speculation, guess and surmise."

■ There can be no doubt that the quoted ground is that the verdict was excessive, and an award of a new trial on that ground (or that the verdict was inadequate) is a ruling that the verdict is against the weight of the evidence. Such a ruling is peculiarly within the sound discretion of the trial court, which may weigh the evidence, a function not permitted appellate courts in review of a jury-tried action. Union Elec. Co. v. McNulty, Mo., 344 S.W. 2d 37, 39[1]; Greco v. Hendricks, Mo., 327 S.W.2d 241, 245[2–4]; Bell v. Bell's Estate, Mo.App., 368 S.W.2d 544, 545[1–3]; Bertram v. Wunning, Mo.App., 417 S.W.2d 120, 126[7]; Mohesky v. City of Washington, Mo.App., 432 S.W.2d 364, 365–366 [1, 2].

■ To paraphrase the leading case on the subject, Cluck v. Abe, 328 Mo. 81, 40 S.W.2d 558, 560[5], it was within the exclusive province of the trial court to determine whether the verdict in this case was against the weight of the evidence and it determined that question when it sustained defendant's motion and awarded it a new trial. This court is powerless to interfere with that ruling because it has no authority to pass upon the weight of the evidence. See also Baumle v. Smith, Mo., 420 S.W.2d 341, 345[5–7]; Bakelite Co. v. Miller, Mo., 372 S.W.2d 867, 871[6, 7].

■ Certain exceptions to this rule have been recognized. Coghlan v. Trumbo, Mo., 179 S.W.2d 705, 707[10, 11]. Appellant, however, attempts no demonstration of exception nor is there complaint of any abuse of discretion and, in that absence, there is *no exception or alleged abuse* to review. Gosnell v. Camden Fire Ins. Ass'n,

Mo.App., 109 S.W.2d 59, 65[2]. Should appellant's contention be viewed as a charge of abuse of discretion, suffice to say that in exercise of its discretionary function of weighing the evidence, the trial court could take into consideration all of the evidence and not merely that favorable to plaintiff. It had a right to consider any conflicting evidence, and to evaluate all the evidence, particularly that on this damage issue, within the trial court's superior opportunity to see, hear, and observe the witnesses who testified. Steuernagel v. St. Louis Public Service Co., 361 Mo. 1066, 238 S.W.2d 426, 431[9–11]. If there had been no evidence from defendant, or if testimony favorable to defendant was assumed to be "inherently impossible and unbelievable and so contradictory as not to amount to substantial evidence," such furnishes no reason for saying that the jury had to believe plaintiff's evidence. Cluck v. Abe, supra.

Finally on this matter, it should be observed that the supreme court has recently reexamined and reafirrmed the history and rationale of granting one new trial on the ground that the verdict was against the weight of the evidence. Clark v. Quality Dairy Co., Mo., 400 S.W.2d 78.

Solmica's appeal for a new trial on its counterclaim charges error in giving a converse to its verdict-directing instruction.

Defendant's counterclaim was submitted by Instruction No. 4:

"Your verdict must be for defendant on defendant's Counter-Claim for damages if you believe:

"First, plaintiff sold Solmica Plasticlad and Primer to defendant, and

"Second, the plaintiff knew or should have known by using ordinary care of the use for which defendant purchased the Solmica Plasticlad and Primer from plaintiff, and

"Third, defendant reasonably relied upon plaintiff's judgment as to the fitness of the

Solmica Plasticlad and Primer for such use, and

"Fourth, the Solmica Plasticlad and Primer were not fit for such use, and

"Fifth, as a direct result defendant was damaged."

Plaintiff's converse was Instruction No. 5: "Your verdict must be for plaintiff, on defendant's counter claim, unless you believe that defendant reasonably relied upon plaintiff's judgment as to the fitness of plaintiff's formula known as 'Solmica Plasticlad', and that the formulation by plaintiff of 'Solmica Plasticlad' was not fit for use as a coating system for properly treated aluminum coil to be used as siding for buildings."

■ Solmica contends the converse to be erroneous because it "refers to 'judgment as to fitness of plaintiff's formula' when * * * the only issue in defendant's verdict directing instruction is that of the fitness of such use, and not the fitness of the formula." Solmica contends also that the "portion * * * 'properly treated aluminum coil to be used as sidings for buildings' converses a matter not set out in defendant's verdict directing instruction, and therefore requires evidence in support thereof."

The first part of this charge is simply a matter of semantics. MAI 29.01 Converse Instructions—General Comment provides that a verdict-directing instruction may be conversed in one of three ways, one of which is to use an instruction beginning, as does No. 5, "Your verdict must be for _____ unless you believe," followed by one or more of the propositions submitted by the verdict-directing instruction and "in substantially the same language used in the verdict-directing instruction being conversed. This form requires no independent evidence to support it." "Judgment as to fitness of plaintiff's formula known as 'Solmica Plasticlad'" in the converse instruction is substantially the same language as "judgment as to the fitness of the

Solmica Plasticlad" in defendant's verdict-directing instruction, and the two statements cannot be said to convey a different meaning.

■ The second complaint that there is no evidence to support the statement "properly treated aluminum coil to be used as sidings for buildings," is without merit because that is what defendant's counterclaim and defense were all about and much of three transcript volumes of testimony was devoted to that subject.

■ In the conclusion of its brief, Plas-Chem observes that "the trial court showed only concern with the question of damages, which certainly was the simplest and least controversial aspect of the litigation. Moreover, the trial court ordered a new trial on all issues in plaintiff's case, apparently not even affording credence to the evidence, from the cases of both plaintiff and defendant, of the material delivered and not paid for." If this is intended to suggest a new trial limited to damages only, or to a part of damages only, it is not supported by any authority or argument. In such circumstances, the appellate court defers to the trial court's exercise of its wide discretion in respect to the scope of the new trial. Coonis and Fortner v. City of Springfield, supra, 319 S.W.2d 1. c. 528 [10, 11]; Thomas v. Durham Motors, Inc., Mo.App., 389 S.W.2d 412, 416 [9, 10].

Judgment awarding new trial to defendant on plaintiff's petition and in favor of plaintiff and against defendant on defendant's counterclaim is affirmed.

HOUSER, and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.