COACH HOUSE OF WARD PARKWAY,
INC., a Corporation, Plain-
tiff-Appellant,

v.

WARD PARKWAY SHOPS, INC., a Corpora-
tion, Defendant-Respondent and
Third-Party Plaintiff,

v.

Virginia JACQUES, Executrix of the Estate
of Horton Jacques, Deceased, Respond-
ent and Third-Party Defendant.

No. 54402.

Supreme Court of Missouri,
Division No. 1.

Oct. 11, 1971.

George M. Winger, William G. Levi, Kansas City, for appellant; Smith, Schwegler, Swartzman & Winger, Kansas City, of counsel.

Morrison, Hecker, Cozad, Morrison & Curtis, Byron J. Beck, W. A. Feiock, Kansas City, for respondent Ward Parkway Shops, Inc.

Margolin & Kirwan, Robert A. Goodman, Kansas City, for respondent Virginia Jacques.

BARDGETT, Judge.

This case comes to the writer on reassignment. This is an action on contract brought by plaintiff-appellant (herein referred to as "Coach House"), a lessee against its lessor, defendant-respondent Ward Parkway Shops, Inc. (herein referred to as "Ward Parkway") seeking damages consisting of loss of profits resulting from alleged breach of a covenant contained in Article 9 of the lease between the parties whereby Ward Parkway agreed not to lease or permit the use of premises within a specified area to others "as a store handling female sportswear as a principal part of its business."

The cause was tried to the court without a jury. At the conclusion of plaintiff's evidence, the court sustained Ward Parkway's motion for directed verdict which, in a nonjury case, is more appropriately termed a motion to dismiss. S.Ct.Rule 67.02, V.A.M.R.; Moser v. Williams, Mo. App., 443 S.W.2d 212, 215.

The issues presented on this appeal involve only plaintiff and defendant and do not involve the issues in the indemnity action between defendant as third-party plaintiff against Virginia Jacques, executrix of the estate of Horton Jacques, deceased, third-party defendant. Horton Jacques was the exclusive leasing agent for defendant.

██ Ward Parkway offered no evidence and the record does not indicate whether it had evidence to offer in the event its motion to dismiss had not been sustained. Since this is a court-tried case, we are to review the case upon the law and the evidence as in suits of an equitable nature. S.Ct.Rule 73.01, V.A.M.R. However, in view of the manner in which this case terminated in the trial court, we cannot review the case on its merits and can do no more than determine whether the trial court correctly dismissed plaintiff's petition and entered judgment for defendant at the close of plaintiff's evidence. Jones v. Gar-

den Park Homes Corp., Mo., 393 S.W.2d 501, 503.

Prior to sustaining Ward Parkway's motion to dismiss and entering judgment for defendant, the court sustained defendant's objection to certain evidence offered by plaintiff as to the fact of damage and the amount of damages. The record reflects that plaintiff made extensive offers of proof on these issues, which offers were rejected by the court. We therefore must decide whether the court properly rejected the proffered evidence and, if erroneously rejected, whether the proffered evidence was sufficient to make a prima facie case. Thus the scope of this review is limited to the question of whether plaintiff made a prima facie case, and for this purpose only we view the admissible evidence in the light most favorable to plaintiff.

In connection with the court's ruling sustaining defendant's objection to damage evidence and in conjunction with sustaining defendant's motion to dismiss, the court stated that defendant's motion for directed verdict "is sustained on the basic ground that the plaintiff has no competent evidence showing damages in any amount suffered by the plaintiff from the actions of defendant, even assuming that Article 9 of the lease between the plaintiff and the defendant has been breached. The Court believes that from the evidence introduced into the case by the plaintiff, there is substantial competent testimony and evidence as to breach. The motion of the defendant * * * is not sustained on the ground that there is no competent evidence as to breach. The Court feels that the evidence offered and refused as to damages, is too remote, speculative and conjectural to constitute competent testimony or proof. The Court makes this ruling on the assumption that the hypothesized matters submitted in the hypothetical question to Mr. Nelson, and which presumably would also be submitted to the other witnesses, offered by the plaintiff on the question of damages, could be supported by some competent evidence and that the admitted gaps in some of the propositions offered could be construed so that any damage witness could consider the various items and elements raised in the hypothetical question, as all being grounded in some evidence. * * *"

Article 9 of the lease provides in part:

"Lessee agrees to conduct on the leased premises a retail store merchandising quality female sportswear clothing, wearing apparel, specialty items, accessories and shoes or any other lines of merchandise generally carried by a quality female sportswear clothing store, including but not limited to merchandise and services handled or performed in other affiliated or associated Coach House stores. *Lessor covenants and agrees that it will not lease to or permit the use of other premises* in that part of the Shopping Center being developed in accordance with Exhibit 'A', except those areas marked thereon as 'future development,' and except for the tenants enumerated heretofore, *as a store handling female sportswear as a principal part of its business.* This restriction shall not apply, however, to a department store handling such items, above described, as an incidental, but not the primary, part of its business." (Emphasis ours.)

Plaintiff's evidence was that in November 1959 defendant, Ward Parkway, entered into the written lease with Richard B. Mindlin, president of plaintiff company, who on August 1, 1962, assigned it to plaintiff Coach House. The lease was made prior to the building of defendant's Ward Parkway Shopping Center. The lease provided for the leasing of a storeroom at the Center for a period of ten years after completion of common facilities at the Center.

Coach House opened for business on August 16, 1962, at a time when the Center was still under construction. On January 29, 1963, Ward Parkway entered into a lease with Burton O. Lisman, d/b/a Lisman's. Lisman's shop opened on or about March 30 or 31, 1963. Lisman's store was

located within the area described in exhibit A of plaintiff's lease (referred to in Article 9 of plaintiff's lease, *supra*), and approximately 130 feet from the Coach House store.

On April 4, 1963, defendant received a letter purporting to give notice to defendant that it had breached Article 9 of the lease by reason of the opening of the Lisman store on or about March 31, 1963.

Defendant asserts that plaintiff's evidence was insufficient to establish that Lisman's operation constituted a breach of the Coach House lease.

If the evidence was sufficient to permit the trial court to find that the premises leased by defendant to Lisman were used "as a store handling female sportswear as a principal part of its business" then defendant's point must be overruled.

■ "Female Sportswear" is a term the parties used in Article 9 of the lease. The lease obligates plaintiff to conduct a retail store "merchandising quality female sportswear clothing, wearing apparel, specialty items, accessories and shoes or any other lines of merchandise generally carried by a quality female sportswear clothing store, including but not limited to merchandise and services handled or performed in other, affiliated or associated Coach House stores."

Richard Mindlin testified that he was president of plaintiff company; that he has been in the female clothing business since 1946; that he worked in executive positions in the female clothing departments of stores in New York, Houston, Texas, and Pittsburgh, Pennsylvania, and went into business for himself in 1955 under the Coach House name, opening a shop at 63rd and Brookside and thereafter two more Coach House shops. Coach House merchandise has been and is strictly women's sportswear, consisting of sweaters, blouses, shirts, casual dresses, swimwear, car coats, separates, knitwear, miscellaneous sportswear, and accessories limited to accessories that accentuate sportswear apparel. The Coach House store at defendant's Center consisted of basically the same merchandise. Eighty to ninety-five percent of plaintiff's merchandise is women's sportswear. Horton Jacques, defendant's exclusive leasing agent, visited plaintiff's other Coach House stores in the Kansas City area while they were working out the lease for the Ward Parkway shop.

Defendant made repeated objections to questions asked of witnesses Mindlin, Patricia Patzer, Winifred Schumacher and Richard Nelson, as to whether there is a category of merchandise recognized in the trade as "female sportswear" and, if so, what it consisted of, on the grounds that the question called for a conclusion on an ultimate issue in the case, invaded the province of the court, and the witnesses were not qualified to answer. In most instances the objection was overruled and defendant asserts error.

■ "Female Sportswear" was a term used by the parties in Article 9 of the lease with relation to the type of store plaintiff was required to operate as well as the type of store defendant was prohibited from permitting others to operate within the area specified therein.

We cannot say that the definition of "female sportswear" can be judicially noticed. It was proper for the trial court to permit the witnesses to testify as to the items or types of clothing encompassed by the trade term "female sportswear". The witnesses noted all testified to substantial experience in the field of women's clothing and knowledge of various clothing categories, including "female sportswear". The defendant is, of course, correct when it says that the question of whether or not Lisman's sold female sportswear was one of the issues for the court to decide, and it is for this reason that it was proper for the court to receive evidence as to its meaning in the retail clothing trade. In short, the witnesses testified that "female sportswear" encompassed the same items

that Mindlin stated were sold by the other Coach House stores as well as the Ward Parkway Coach House store. The court did not err in permitting this testimony.

▮ Mindlin examined the Lisman store at the Center on twenty-five to one hundred occasions beginning when the store opened in 1963 to the time of trial in November 1968. On most of these occasions he would examine the contents of the store from the outside and on several occasions looked over Lisman's merchandise inside the store. On these inspections he saw blouses, coordinates, skirts, swimwear, short and long pants, casual dresses, knit dresses, dressy dresses, car coats, and leather coats displayed in Lisman's store.

Winifred Schumacher testified that since 1937 she has been in the business of doing shopping surveys, comparison shopping, and performing other shopping services for retailers and wholesalers, and is the manager of Store Service Bureau in Kansas City. At plaintiff's request she made a shopping survey of the Lisman store on July 2, 1963 (plaintiff's exhibit 12); December 16, 1963 (plaintiff's exhibit 13); November 30, 1966 (plaintiff's exhibit 14); and on May 1, 1968 (plaintiff's exhibit 15). The exhibits appear to have been used to refresh the witness' recollection as to items observed and counts made. A survey consisted of the witness going to Lisman's, counting the items on display, and listing them in categories, e. g., 75 two-piece separates, 125 swimsuits. We will not list all of the items here. Suffice it to say that under the evidence the court could have found that on July 2, 1963, approximately 75% of the merchandise displayed was "female sportswear"; that on December 15, 1963, it was approximately 80% "female sportswear"; that on November 30, 1966, it was about 70%, and on May 1, 1968, it was about 80% "female sportswear".

Patricia Patzer "shopped" Lisman's on April 29 and May 2, 1968. She counted the items of merchandise on display by categories and testified the merchandise at Lisman's was almost the same as at Coach House.

The trial court indicated its belief that plaintiff's evidence was sufficient to support a finding that the lease had been breached by defendant. We have reviewed the record and conclude that the trial court's finding in this respect was not clearly erroneous. We add however that our conclusion is not a final determination of this issue as that will be a matter for the trial court to decide on retrial under all the evidence in the case.

Defendant contends that plaintiff's hypothetical question does not state facts which would provide a rational basis for an opinion on damages, and that plaintiff failed to adduce sufficient evidence to establish the fact of damage and amount of damages.

We have concluded that the admissible evidence offered by plaintiff was sufficient to make a prima facie case and the cause must be remanded for new trial. It is not necessary therefore to pass upon the various objections leveled at plaintiff's hypothetical question, as they may not arise on retrial.

▮ Richard Nelson, referred to *supra,* a consultant in the field of real estate economics and planning, testified in behalf of plaintiff principally on the issue of damages. He testified to extensive experience in the field of the economics of real estate development and particularly in the area of shopping center development and redevelopment. He has been connected with the development of about two hundred shopping centers from the developer's point of view and he had examined at least that many from the standpoint of the major tenant of a center. He has examined hundreds of female sportswear specialty shops in shopping centers in connection with advising developers as to the proper tenant mix in a center and where in the center the stores should be located as part of overall shopping center development. His work involves the design of shopping centers but in most cases he designs the

tenant mix of a center. He has authored dozens of articles in the real estate appraising field and in the field of merchandising in *Chain Store Age,* and *Women's Wear Daily Journal,* as well as books pertaining to commercial locations and the proper development of shopping centers. Mr. Nelson examined the plaintiff's store and Lisman's store on February 13, 1967, and November 23, 1968, and testified that Lisman's was a "female sportswear" store.

A hypothetical question was put to Mr. Nelson in which, in short, he was asked to assume that defendant and plaintiff entered into a lease on November 4, 1959; that plaintiff opened for business on August 16, 1962; that plaintiff conducts a business which sells "female sportswear" as a principal part of its business; that plaintiff Coach House of Ward Parkway operates in a manner comparable to other Coach House stores; that on January 28, 1963, defendant entered into a lease with Burton Lisman for a store in the Center located in the area covered by the exclusive clause contained in Article 9 of the Coach House lease; that the Lisman lease requires Lisman to operate "a retail store for medium priced women's wear, including accessories in a price range and quality as is carried by tenants of other stores", and further provides that he will not sell "exclusive female sportswear" in the demised premises; that Lisman has been operated at all times since it opened and displayed stock for sale and carried a stock of merchandise consistent with shoppers' reports, plaintiff's exhibit 8 dated April 29 and May 2, 1968, plaintiff's exhibit 12 dated July 2, 1963; plaintiff's exhibit 14 dated November 30, 1966; and plaintiff's exhibit 15 dated May 1, 1968; that the price range for Lisman's merchandise and Coach House merchandise is the same; that in some instances both stores carried labels from the same manufacturer; that the clientele of both stores is from teenagers to the young-married category; that Lisman's sales by lease year ending March 31 of each year are—(figures for 1964 through 1968 were hypothesized); that Lisman's calendar-year sales from 1965 through 1967 were—(figures were hypothesized); that Coach House sales for each fiscal year ending January 31 were—(figures for 1963 through 1968 were hypothesized); the total sales of Ward Parkway Shopping Center, operated by defendant, were hypothesized for 1964 through 1967, and then the witness was asked, based on the assumptions noted and on his inspections of Coach House and the Lisman store on February 13, 1967, and November 23, 1968, whether he had an opinion whether the operation of Lisman's involves the sale of "female sportswear", and the witness responded, "Yes". He was then asked for his opinion. Defendant objected and several pages of colloquy between counsel and court and counsel ensued. The witness was permitted to answer and said that Lisman "handles sportswear and it is principally a sportswear shop." On defendant's motion the court then struck "it is principally a sportswear shop" as not responsive.

Thereafter the witness was asked if he had an opinion, based upon the facts he was asked to assume and his experience, as to whether Lisman made sales of merchandise which, but for Lisman's operations, the Coach House store would make, to which he answered, "Yes". Next he was asked to state his opinion. Defendant objected on the grounds it would be mere speculation and the court sustained on the grounds that the answer would be "purely guesswork".

Thereafter the following offer of proof was made by plaintiff through witness Nelson: "Q (By Mr. Winger) Mr. Nelson, you have testified that in your opinion Coach House would be entitled to a percentage of the Lisman sales and would have made those sales but for the presence of Lisman and its operations at the Ward Parkway Shopping Center?

A That is my opinion.

Q Now, would you tell the Court, and this is by the way of an offer of proof, what percentage of Lisman sales do you believe that Coach House is entitled to?

A Thirty-three and one-third per cent (33⅓%).

Q Now, I ask you, Mr. Nelson, to explain to the Court how you arrived at a figure of 33⅓ per cent.

A I have been involved in a lot of shopping centers which have been removed and others that have been added and where there have been changes in tenant mix, and so on. In my experience, if you had substracted the tenant Lisman, that 50 per cent of Lisman's business would have disappeared from the center.

Q Entirely?

A Entirely. It would have gone to Lisman's outlet at some place else, some of it might not have ever been spent at all. It could have been spent on services, or impulse purchases, or it would have gone to other shopping centers downtown, etc. That 50 per cent of the sales would have been retained in the other outlets in the shopping center for reviewing like these sportswear departments of Montgomery-Ward's, and Woolf Brothers and Woolf's particularly, of course, and the Coach House, which carries the same line of merchandise, and the same price category, and it caters exactly to the same group of people. At the time I was there, all of them were teenagers and what appeared to be young mothers, and of the 50 per cent, which all the other outlets in the shopping center will retain, it is my opinion that the Coach House would achieve two-thirds of that 50 per cent, or a total of 33⅓ per cent of the Lisman sales over the period that they were in operation.

Q Do you have any other factors on which you base your opinion, and I direct you specifically to a comparison of the sales of the shopping center as compared to Coach House?

A Yes, sir, I have an opinion. From an examination of the figures on the sales at the center as a whole, particularly taking into account the years of 1964 through 1967, which are the most recently counted, the sales of the total center have increased at about the same rate as the increase of sales of the Coach House. It was very close. The fact is as the center matures, the generator which causes people to come there initially, when they aren't familiar with the center, and the sales of the center as a whole, do not increase at the same rate as the specialty shops on the mall. As soon as people become acquainted with the whole operation it becomes a total identity to them and they know all of the shops on the mall, and you get a greater increase in sales over a period of time in the smaller shops. This is what shopping center development is all about. I just appraised nineteen Penney's stores, which were on land which was given to them. They built the stores and the developers just were left with the balance of the stores, and hopes to get these increases in sales and the percentage which makes this shopping center profitable, so it is typical for a maturing center, for the small shops to increase as fast in percentage of sales in the center as a whole. And it is about the same in this case.

Q What would happen, what you have testified appeared to be true, if you added together, just for the purposes of illustration, the Lisman and Coach House sales at Ward Parkway, both of them being specialty stores, by the definition which you have used; would the total sales of both stores combined, as compared to the shopping center sales as a whole, support the theory which you have expressed, based upon your experience that the specialty stores' sales should increase at a greater rate as the center matures and the sales of the center as a whole?

A If you added a third of Lisman's sales to the Coach House sales, you would still not have a percentage increase any greater

than some of the specialty stores in the shopping center have achieved during this period of time, particularly from 1964 to 1967, where I got the most comparable information."

Plaintiff made an additional offer of proof which, among other things, converted the evidence that plaintiff would have received one-third of the sales made by Lisman's into profit figures based on the amount of income represented by one-third of Lisman's sales. This offer consisted of a narration of what a certified public accountant's testimony would be and plaintiff's exhibit 20, a statement of operations of plaintiff company for the years 1964, 1965, 1966, 1967, and 1968, and a pro forma statement of operations based on actual sales made by plaintiff, plus 33⅓ of Lisman's sales for the same years noted supra, and took into account business expenses, taxes and other items which must be considered in arriving at the net profit figure. On the basis of the one-third of Lisman's sales being made by plaintiff, plaintiff's profits would have been increased as follows: For 1964—$5,500; for 1965—$7,300; for 1966—$7,700; for 1967—$9,700; for the year ending February 3, 1968—$12,600. The court sustained defendant's objection to this offer of proof on the grounds that the evidence offered to support it, to wit, Nelson's testimony that plaintiff would have enjoyed one-third of Lisman's sales was speculative, conjectural, guesswork, and therefore incompetent as proof. We hold that the trial court erred in holding that Nelson's testimony was inadmissible as mere speculation, conjectural and guesswork.

Flagg v. Andrew Williams Stores, 127 Cal.App.2d 165, 273 P.2d 294, is a case in which damages consisting of lost profits were sought for breach of a non-competition covenant in a lease within a comprehensive shopping center. The court there allowed a business consultant to give an opinion as to the effect that one restaurant business has upon another by reason of competitive location. He inspected both restaurants and analyzed and compared conditions and operations of each. Based upon his observations and analyses of financial statements, he concluded that one-half of the business done by the offending restaurant would have gone to plaintiffs if the offending store had not been there and then reduced the shift of business into sales volume and profit. The court said loc. cit. 299, "Rothman's estimate that one-half of the Belcher business would have gone to plaintiffs does not impress us as mere speculation. It was based upon the knowledge gained by his wide experience and extensive observations in the restaurant business for many years which he applied by intensive study and analysis to the two restaurant operations here involved. * * * There may be some element of uncertainty but not such a degree of uncertainty as to render the testimony speculative. There is no uncertainty as to the fact of damage, that is, as to the nature, existence or cause of the damage. The same certainty as to the amount of damage is not required. 'One whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages cannot be measured with exactness.' [citing cases]."

Plas-Chem Corp. v. Solmica, Inc., Mo., 434 S.W.2d 522, was a suit for damages, consisting of loss of profits, for breach of contract. In setting forth the law relating to this type of case, this court stated loc. cit. 526: "Plas-Chem's theory of trial was to make a case on the law of damages for breach of contract as stated in the Restatement of the Law of Contracts, Volume I, Section 331: 'Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty'; and the comment: 'Furthermore, there are cases in which the experience of mankind is convincing that a substantial pecuniary loss has occurred, while at the same time it is of such a character that the amount in money is incapable of proof. In these cases the defendant

usually has reason to foresee this difficulty of proof and should not be allowed to profit by it. In such cases, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual supervisory power of the court.' See also General Ins. Co. of America v. Hercules Construction Co., 8 Cir., 385 F.2d 13, 20; Red-E-Gas Co. v. Meadows, Mo. App., 360 S.W.2d 236, 240; Coonis and Fortner v. City of Springfield, Mo., 319 S. W.2d 523, 528[7]; Spruce Co. v. Mays, 333 Mo. 582, 62 S.W.2d 824, 828[5]; Metropolitan Broadcasting Corp. v. Lebowitz, 110 U.S.App.D.C. 336, 293 F.2d 524, 90 A. L.R.2d 1193."

The lease between the parties reflects that it was carefully drawn by business men who were knowledgeable about the various factors which influence the volume of business and consequently profits derived from the operation of stores in a comprehensive shopping center. It recognizes a concept that the business done by one store in such a concentrated shopping center is affected by the existence of other stores of specific types. For instance, plaintiff was not obligated to commence its lease until other specified stores commenced business. An amendment to the lease provided that plaintiff would pay as rent 5% of gross sales, and no minimum or guaranteed rent until another store of a specific type opened in the shopping center. Thus the lease itself demonstrates a concern by the parties as to the "tenant mix" of the shopping center, and relates to the very object a merchant is in business to achieve—profits.

All of the business enterprises in defendant's shopping center were new, and the lease demonstates that the parties contemplated that the financial success of any one business depended in part on the existence of other specified types of shops *and* the relief from competition within the proscribed area of the shopping center of a directly competing enterprise.

The covenant undertaken by defendant lessor in Article 9 of the lease whereby defendant agreed not to permit the use of premises within a defined area for a "store handling female sportswear as a principal part of its business" also has for its purpose the enhancement of plaintiff's opportunity to do business with people who come to the Center by eliminating a particular type of direct competition from the "tenant mix", and thereby realize a larger profit than would be realized with the existence of direct competition.

If defendant permitted Lisman's to utilize premises within the proscribed area for use "as a store handling female sportswear as a principal part of its business", then the lease was breached. The lease itself demonstrates that the parties contemplated that a diversion of business from plaintiff's store to an offending store would occur if the lease was breached in this respect.

Thus the anticipated method of damage, to wit; loss of business to a directly competing store, was not merely a collateral consequence of a breach of contract, but rather the direct and contemplated result of a breach of a specific covenant, the very existence of which was for the purpose of preventing such a diversion of business.

Defendant relies on a line of cases exemplified by Coonis v. Rogers, Mo., 429 S. W.2d 709, and Anderson v. Abernathy, Mo., 339 S.W.2d 817, for the general proposition of law to the effect that recovery of anticipated profits of a commercial business are too remote, speculative to warrant recovery except where they are made reasonably certain by proof of actual facts with present data for a rational estimate of their amount. This is and has been the rule in Missouri. However, in Hargis v. Sample, Mo., 306 S.W.2d 564, 569, also cited by defendant, this court in speaking of the certainty with which loss of profits must be shown said: "True, in some cases all that can be required is to produce all

the relevant facts tending to show the extent of damage and one is not to be excused for a breach of contract resulting in damages simply because those damages may not be established with exact certainty. Wright v. Ickenroth, Mo.App., 215 S.W.2d 43, 45[6, 7]. It has been said, however, that the amount of estimated loss of earnings (and the same would apply to loss of prospective profits) should, in the event of uncertainty, at least be supported by the best evidence available. Moss v. Mindlin's, Inc., Mo., 301 S.W.2d 761, 773[12]."

We believe this case comes within the rule set forth in Plas-Chem Corp. v. Solmica, Inc., *supra,* as being one where if the breach exists, the experience of mankind is convincing that a pecuniary loss has occurred while at the same time the exact amount of damage is not susceptible of being ascertained with certainty.

The witness Nelson testified to a wide range of experience in the field of shopping center development, tenant mix, and knowledge concerning the shift in business within a shopping center when there is a change in tenant mix and qualified as an expert in the economics of shopping centers so as to be able to offer an opinion as to the shift in business within a center when a particular tenant mix exists. It, Nelson's testimony, left some uncertainty as to the amount of damage but, as in Flagg v. Andrew Williams Stores, *supra,* not such uncertainty as to the fact, nature, existence, or cause of the damage as to render it wholly lacking in probative value.

We hold that the court erred in excluding from the evidence the opinion of witness Nelson concerning the shift in business consequent to the existence of Lisman's store within the proscribed area of the shopping center. The court, of course, is not bound by the estimates or opinions of the witnesses. The weight to be given such evidence is for the court to determine in arriving at its final judgment in the cause. All we determine here is that on the record before us the evidence should not have been excluded as mere speculation as it does provide a rational basis for estimating the amount of damages, if any.

Much of defendant's argument is directed to the plaintiff's failure to produce the books and records of Lisman's store on the issue of whether or not Lisman's was a store handling "female sportwear" as a principal part of its business and the amount of sportswear, if any, sold by Lisman's as it would bear on the amount of damages. Lisman's was not a party to this suit and the availability or nonavailability of any such records does not appear from the record. Nevertheless, what this court said in Hargis v. Sample, supra, loc. cit. 569, appears appropriate here: " * * * [W]e observe for whatever it may be worth that the record as to the extent of plaintiff's damage is not as satisfactory as it apparently could have been and, in order to obviate future questions as to the sufficiency of the evidence as to the extent of damage sustained, particularly future questions as to excessiveness of verdict, plaintiff would be well advised to adduce or account for any and all records which would aid in tending to more accurately establish the amount of dollar damage sustained."

The appellant urges that the trial court erred in refusing to permit Richard B. Mindlin, plaintiff's president, to testify as to the loss of sales sustained by plaintiff. The cases cited by plaintiff in its brief do not support the admissibility of Mindlin's opinion testimony nor do they illustrate an abuse of discretion on the part of the trial court. While it is generally true that an owner is allowed to testify as to the reasonable value of his property, it is obvious that ownership does not in itself qualify one to express opinions on matters not falling within his experience. As was pointed out in Langdon v. Koch, Mo.App., 393 S.W.2d 66, 70: " * * * [J]udicial liberality in permitting an owner to testify as to market value should not be treated as an unrestricted license to engage in guesswork." To attempt to say that he, as an owner, would be entitled to 50% of anoth-

er owner's sales certainly goes far beyond the areas in which this court has allowed other owners to testify as to value of property.

As indicated earlier in this opinion, we go no further than to say that on the record before us, plaintiff made a prima facie case and the court, therefore, erred in sustaining defendant's motion to dismiss at the close of plaintiff's case.

The judgment of the circuit court is reversed and the cause is remanded for a new trial on all issues.

HOLMAN, P. J., and SEILER, J., concur.

HESS, Special Judge, dissents.