**RALSTON PURINA COMPANY, Plaintiff,**

v.

**CUSTOM CANNERS, INC., Defendant.**

No. 77–907C(2).

United States District Court, E. D. Missouri, E. D.

Nov. 24, 1980.

Frederick H. Mayer and Frank N. Gundlach, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for plaintiff.

John J. Donnelly, Strubinger, Dowd, Donnelly, Haseltine & Wilbers, St. Louis, Mo., for defendant.

## MEMORANDUM

NANGLE, District Judge.

This case is now before the Court for decision upon the merits. Plaintiff brought this action pursuant to 28 U.S.C. § 1332 seeking to recover over one million dollars in damages due to defendant's alleged breach of contract, breach of warranty, and negligence.

This case was tried before the Court sitting without a jury. This Court, having considered the pleadings, the testimony of the witnesses, the exhibits, and the depositions in evidence, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52, Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Plaintiff is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business in that state. it is engaged in the production and marketing of a variety of animal food products, including canned cat food.

2. Defendant is a corporation organized and existing under the laws of the State of New York, with its principal place of business in that state. At all times relevant to this action, it was engaged in the manufacture and packaging of various food products, including canned cat food.

3. In mid–1974 plaintiff was experiencing a demand for its Purina Variety Menu ("PVM") canned cat food greater than it could fulfill with its existing manufacturing facilities. Plaintiff therefore sought to enter into co–packing agreements with other canners under which the co–packer would manufacture and package PVM for sale by plaintiff.

4. On or about June 14, 1974, plaintiff and defendant entered into a written co–packing agreement whereby defendant agreed to manufacture and package 420,000 cases of PVM, twenty–four cans per case, six and one–half ounces of PVM per can. Defendant commenced manufacturing and packaging PVM under this contract on or about September 1, 1974.

5. On or about September 23, 1974, a second written agreement was entered into whereby the manufacture and packaging of an additional 910,000 cases was contracted for. On or about January 24, 1975, the September contract was renewed such that defendant would manufacture and package 200,000 cases of PVM per month for the months of March through September 1975. This agreement was subsequently modified, by addendum dated April 14, 1975, to reduce the quantity to 160,000 cases per month for the months of April through August, 1975. Plaintiff terminated its relationship with defendant in September 1975.

6. Under the terms of these agreements, defendant expressly agreed to produce, store and handle the product and ingredients in accordance with the Code of Federal Regulations ("CFR"), Title 21, Part 128(b), Current Good Manufacturing Practice Regulations. Defendant further agreed to conform with the current good manufacturing practices in the canned cat food industry and those agreed upon with plaintiff.

7. After defendant finished manufacturing and packaging the PVM, the finished product was shipped to a storage facility owned or under the control of plaintiff. The majority of the PVM manufactured by defendant was shipped to plaintiff's warehouse facility in Port Jersey, New Jersey.

8. Prior to contracting with defendant, plaintiff inspected defendant's facilities and found them to be satisfactory.

9. Defendant was required to follow the plans and specifications supplied by plaintiff. Included within these plans and specifications was a quality control program. This quality control program, as relevant to this case, involved the weighing of a representative sample of the cans to ensure that they were being filled with the right amount of cat food.

10. Each half hour, six cans would be pulled from the production line by defendant's quality control personnel. The cans would be weighed in comparison with a test can to determine if they weighed more or less than the test can, and by how much. The average difference would be computed, as well as the range of differences. This information would be plotted on an XR chart. Two such charts were filled out each day, one for each shift. These charts were ultimately sent to plaintiff.

11. The test can used in this weighing process was an empty can filled with weights equalling the target weight at which the filler machine was set. The cans themselves were changed whenever a new can supplier was contracted with, to compensate for any possible difference in the weight of the cans.

12. The target weight was selected such that, allowing for variances caused by the inaccuracy of the machine, the great majority of the cans produced would contain more than the weight listed on the label of the can, 6.5 ounces. Initially, the target weight was 6.75 ounces. After a capability study was run, however, the target weight was lowered to 6.64 ounces. Defendant collected all the data for the capability study and sent it to plaintiff. Plaintiff actually did the calculations to come up with a target weight of 6.64 ounces.

13. This quality control program, if properly followed, should have adequately assured that the proper quantity was being placed in the cans.

14. Defendant's quality control supervisor was trained by plaintiff. She was initially taken to plaintiff's Davenport, Iowa plant to observe plaintiff's techniques, and was given further supervision at defendant's facilities.

15. Defendant sent approximately one case of finished product to plaintiff each week. This representative sample of the product was tested by plaintiff for moisture, protein and fat content. An insufficient number of cans were sent to plaintiff to allow an accurate sample of the weight of the contents, and plaintiff therefore did not weigh the contents.

16. Plaintiff had no complaints during the life of the contract with the quality of the product produced by defendant. Likewise, plaintiff can point to no specific manner in which defendant failed to comply with the plans or specifications of the contract.

17. Plaintiff had no indication during the life of the contract that there might have been a short–weight problem with defendant's product. The XR charts sent weekly to plaintiff gave no such indication.

18. In January, 1976, however, some four and one–half months after the termination of the contract plaintiff became aware of a short–weight problem with defendant's product. Plaintiff was informed at that time that a number of retail grocers in the New York City area had been fined by the Consumer Affairs Bureau of the city for selling short–weight cans. Plaintiff ultimately paid sixteen thousand sixty dollars ($16,060.00) in such fines. The code stamped on the lids of the cans identified them as having been manufactured by defendant.

19. Shortly thereafter, plaintiff sent several employees to its Port Jersey warehouse to sample the weights of the cans. These employees found that a large percentage of the cans manufactured and packaged by defendant were short–weighted. Five hundred sixty dollars ($560.00) in expenses were incurred by these employees.

20. Plaintiff hired the firm of Erhart & Associates to pick up the suspect cans off of retail shelves. Seven thousand six hundred fifty–four dollars ($7,654.00) were spent in this regard. Three hundred ninety–six dollars ($396.00) were also spent by plaintiff's salesmen in purchasing such cans from shelves.

21. Plaintiff hired the firm of H. B. Cannon & Son, Inc. to check–weigh all the suspect cans, relabel them as six ounces where necessary, and repackage them. The fee paid to Cannon for its services, which was fair and reasonable under the circumstances, was two hundred one thousand four hundred eighty–seven dollars ($201,-487.00). Plaintiff also had to pay fifty seven thousand thirteen dollars ($57,013.00) for new cartons in which to repackage the cans and twenty–two thousand eighty–six dollars ($22,086.00) for new labels which reflected the lower weight of the contents.

22. Had there been no problem with the weight of the cans in question, plaintiff would have made a profit on their sale of five hundred sixty–five thousand eight hundred forty–four dollars ($565,844.00). Demand for plaintiff's product was high, as evidenced by the fact that plaintiff entered into co–packing agreements to generate additional volume, and there is no doubt that plaintiff would have sold all the products in question. The profit figure was reached by utilizing plaintiff's historical figures as to profit per case with the PVM product line. These figures were reasonably certain and were not speculative. Had plaintiff sold the goods in question, no additional expenses would have been incurred. Overhead, advertising, and other such expenses would not have varied with the additional volume involved.

23. Instead of making the above profit, however, plaintiff incurred a loss of seventy thousand nine hundred eighty–five dollars ($70,985.00) on the product in question. The cost of goods sold for the product in question was one million ninety–nine thousand seven hundred eighteen dollars

($1,099,718.00).[1] The net sales price of the goods in question was one million twenty–eight thousand seven hundred thirty–three dollars ($1,028,733.00), leaving the above loss. The net sales price is computed by deducting cash discounts and freight from the gross sales price. Reflected within the gross sales price is the fact that no revenue was received for product which was destroyed at H. B. Cannon & Son, Inc., donated to charity, or used as samples in the weighing process. The freight deduction does not include the additional freight claimed by plaintiff, since there was no proof that this freight was, in fact, additional to that which normally would have been incurred.

24. The net sales figure was reasonable under the circumstances. It was impractical and possibly misleading to consumers to place six ounce cans on the shelves of stores next to six and one–half ounce cans. The relabeled cans therefore had to be sold at a low price in order to induce retailers to purchase them. It was similarly not unreasonable for plaintiff to donate those cans which weighed less than six ounces to charity; such cans were not saleable in the normal course of business.

## CONCLUSIONS OF LAW

This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1332. Plaintiff and defendant are citizens of different states, 28 U.S.C. § 1332(c), and the amount in controversy exceeds ten thousand dollars.

Under the terms of the contract between the parties, defendant was obligated to manufacture a certain number of cans of PVM with six and one–half ounces of PVM in each can. Defendant failed to do so. Defendant argues, however, that it is not liable because plaintiff can point to no specific manner in which defendant negligently or carelessly performed its obligations under the contract.

1. This figure does not allow for the additional amount plaintiff claims as expenses due to storage of the product at the Port Jersey warehouse. Plaintiff always had a large quantity of PVM in storage, and there is no evidence that plaintiff was required to store more than the

■ This assertion is true with respect to Counts II and III of plaintiff's complaint. In Count II, plaintiff claims that defendant breached its express warranty to comply with the Current Good Manufacturing Practice Regulations, 21 C.F.R. § 128(b). Plaintiff has failed to show, however, any way in which defendant failed to comply with these regulations. These regulations set up health and safety standards to be followed in manufacturing and canning, and, as far as the evidence shows, defendant fully met all these standards. Likewise, plaintiff has not shown how defendant was in any way negligent in its performance of the contract, as alleged in Count III.

■ As to Count I, however, defendant contracted to put six and one–half ounces of PVM in each can and did not do so. Though plaintiff can point to no reason for this failure, such proof is not necessary.

Defendant relies on *Hall v. Knapp*, 552 S.W.2d 299 (Mo.App.1977), to argue that plaintiff has not shown any connection between the short–weight problem and defendant's performance. That case is not on point, however. In *Hall*, the alleged defect, a leaking basement, was not necessarily the fault of the plaintiff (the defendant in the counterclaim involved in this aspect of the case). Other persons had also been involved and the leaking basement could have been the fault of any of several persons. Here, however, it is hard to imagine whose fault the short–weight problem could have been if not defendant's; defendant was in complete control of the manufacturing process. The cans left defendant's possession sealed, and the quantity of PVM in the cans was not thereafter varied. The quality control program, which plaintiff designed, was not faulty; even defendant's witnesses admitted that it should have properly alerted the parties to any short–weight problem. So

normal quantity due to defendant's actions. Plaintiff has not shown how storage of these particular cans, as opposed to other cans, caused additional expense to plaintiff. The normal storage expense is reflected within the cost of goods sold.

however the short–weight problem arose, it was defendant's fault.

 Defendant also argues that plaintiff accepted defendant's performance in full satisfaction of defendant's obligation. The evidence did not support defendant's claim, however, that plaintiff knew or should have known of the short–weight problem prior to the termination of the contract. Though XR charts were sent to plaintiff weekly, these charts gave no indication of any such problem. Likewise rejected is defendant's argument that plaintiff waived its right to claim a breach of defendant. There is no evidence that plaintiff knew of the breach until after the contract had terminated, a necessary finding before plaintiff can be said to have waived the breach. *Pasley v. Marshall*, 305 S.W.2d 879 (Mo.App.1957).

 Plaintiff is therefore entitled to recover from defendant its damages relating to the short–weight problem. These damages include the fees paid to H. B. Cannon & Son, Inc. to check–weigh, relabel and repackage the cans ($201,487.00), the fines paid with respect to the short–weight cans ($16,060.00), the cartons ($57,013.00) and labels ($22,086.00) purchased for use by H. B. Cannon & Son, Inc., the fees paid to Erhart & Associates for picking up the suspect cans ($7,654.00), the expenses incurred by plaintiff's salesmen in purchasing suspect cans ($396.00), and the expenses incurred by plaintiff's employees in checking the cans at the Port Jersey warehouse ($590.00). These out–of–pocket expenses total three hundred five thousand two hundred eighty–six dollars ($305,286.00).

 Plaintiff is also entitled to recover its lost profits. Lost profits are recoverable to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty. *Vigano v. Wylain, Inc.*, 633 F.2d 522 (8th Cir. 1980); *Red–E–Gas Company v. Meadows*, 360 S.W.2d 236 (Mo.App.1962). Plaintiff has met that burden herein. Plaintiff has shown the number of cases of PVM which were involved, as well as the historical rate of profit per

case on sales of the product. Plaintiff has also shown that the product in question would have been sold in the normal course of business, had there been no problems. Lastly, plaintiff has shown that no additional expenses would have been incurred in selling the product. From this information, plaintiff's lost profit is susceptible of estimation with reasonable certainty. *Swiss–American Import. Co. v. Variety Food Prod. Co.*, 471 S.W.2d 688 (Mo.App.1971). This is not the case of a party seeking profits on a product line with no past history. Plaintiff had sold PVM in the past and its estimate of profit per case is based on this past experience.

Also in this vein, plaintiff is entitled to recover the actual loss sustained. This is merely another aspect of lost profits. These figures are not speculative, but are based on the actual costs and revenues associated with the product in question. Together, the lost profits and losses sustained total six hundred thirty–six thousand eight hundred twenty–nine dollars ($636,829.00). Judgment will be entered accordingly.